Filed 6/10/16; opinion on rehearing

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062656 |
| v. | (Super.Ct.No. FELSS1402746) |
| EDDIE DUNLEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Lorenzo R. Balderrama, Judge. Dismissed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part 3 of the Legal Analysis.

The Mentally Disordered Offenders Act (Pen. Code, § 2960 et seq.)[1] provides for involuntary civil commitment as a condition of parole for prisoners who are found to have "a severe mental disorder" if certain conditions are met. (§ 2962, subds. (a)-(f).)[2] The commitment is for a term of one year and may be extended annually for an additional year on petition of the district attorney. (§ 2972, subds. (a), (b).)

Appellant Eddie Dunley appeals from a judgment extending his commitment as a mentally disordered offender (MDO). He contends that because persons subject to civil commitment after being found not guilty by reason of insanity (NGI) have a statutory right, pursuant to section 1026.5, subdivision (b)(7) (hereafter section 1026.5(b)(7)), not to be compelled to testify in proceedings to extend their commitments (*Hudec v. Superior Court* (2015) 60 Cal.4th 815, 832), so should a person facing commitment as an MDO. He points out that this right has been extended to commitment proceedings for sexually

---

[1] All further statutory citations refer to the Penal Code unless another code is cited.

[2] The conditions include the following: That the prisoner has a severe mental disorder, that the disorder is not in remission or cannot be kept in remission without treatment, that the severe mental disorder was one of the causes or was an aggravating factor in the prisoner's criminal behavior, that the prisoner has been in treatment for the severe mental disorder for 90 days or more within the year prior to his or her parole release day, and that by reason of his or her severe mental disorder, the prisoner represents a substantial danger of physical harm to others. (§ 2962, subd. (d)(1).) The act applies only to prisoners who have been convicted of specified offenses. (§ 2962, subd. (e).)

2

violent predators (SVP)[3] by application of equal protection principles. (*People v. Curlee* (2015) 237 Cal.App.4th 709, 716-722.) He contends that NGI's, SVP's and MDO's are all similarly situated with respect to civil commitment procedures.

We hold that MDO's, SVP's and NGI's are all similarly situated with respect to the testimonial privilege provided for in section 1026.5(b)(7). However, as we will discuss, this appeal is moot because a subsequent petition for recommitment was denied by the trial court on or about March 7, 2016, based on the court's finding that appellant no longer met the criteria for commitment as an MDO. Accordingly, although we will decide the threshold issue, which is purely a legal question and will surely reoccur in MDO proceedings in light of *People v. Curlee*, *supra*, 237 Cal.App.4th 709, we will dismiss the appeal as moot.[4] (*People v. Cheek* (2001) 25 Cal.4th 894, 897-898; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 321.)

<u>PROCEDURAL HISTORY</u>

On June 9, 2014, the San Bernardino County District Attorney filed a petition pursuant to section 2972 to extend appellant's involuntary commitment as an MDO.

On December 17, 2014, a jury found that appellant met the criteria for commitment as an MDO. Accordingly, the court granted the petition and extended

---

[3] See the Sexually Violent Predators Act. (Welf. & Inst. Code, § 6600 et seq.)
[4] We will also address appellant's claim of instructional error because it appears to involve the impermissible shifting of the burden of proof to appellant.

3

appellant's commitment until January 20, 2016.  Appellant filed a timely notice of appeal.

FACTS

While serving a prison term for robbery, appellant had several incidents of battery on correctional officers.  A mental health evaluation was done after each incident.  Both evaluations reported that appellant was disorganized and confused.  One evaluation concluded that appellant showed severely impaired judgment.  The other concluded that he showed psychosis.  In 2008, he was committed to Atascadero State Hospital as an MDO.  He had previously been admitted to Atascadero in 2001.

Dr. Joe Debruin, a forensic psychologist at Atascadero, evaluated appellant to determine whether he met the criteria for recommitment as an MDO.[5]  Dr. Debruin reviewed appellant's treatment plan, interdisciplinary and psychiatric progress notes, previous MDO evaluation reports, and the police report concerning his prior offense.  He also interviewed appellant.

Dr. Debruin diagnosed appellant with schizoaffective disorder, bipolar type, which, he testified, is a severe mental disorder that persists over a period of time.  He testified that appellant had consistently exhibited symptoms of schizoaffective disorder

_____

[5] "If the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted . . . ."  (§ 2972, subd. (c).)

4

since he was committed to Atascadero in 2008. Appellant displayed a belief that he was God or "God's son in the flesh," and reported hallucinations and hearing voices, which sometimes commanded him to be aggressive. He had manic episodes during which he spoke in a rapid, disorganized and incoherent manner. He had mood control difficulties and would fluctuate from being very agitated to being depressed. He had paranoid episodes in which he thought people were "messing with his body organs" and that hospital staff were "telling lies and being corrupt." These symptoms continued to occur in the months preceding the hearing. During his current confinement at Atascadero, appellant had 60 violent episodes. The most recent was in December 2013, when appellant repeatedly punched a fellow patient.

Dr. Debruin testified that appellant lacked insight into his condition, i.e., that he did not believe he was mentally ill or that he needed medication. Appellant did not follow his treatment plan or participate in groups, and he was often unwilling to take his medication. Dr. Debruin opined that if appellant were released into the community, he would not take his medication and that his symptoms would escalate as a result.

Based on appellant's prior offenses, violent behavior, delusional statements and lack of insight into his illness, Dr. Debruin opined that appellant's mental disorder was not in remission and, as a result of the disorder, he posed a substantial danger for violence if he were released into the community.

Dr. Martin Steed, appellant's treating psychiatrist for the year and a half preceding the hearing, testified to the same effect. He diagnosed appellant with schizoaffective

5

disorder, bipolar type, which he characterized as a severe mental disorder. He testified that appellant displayed "extensive irritable mood, grandiosity, increase in self-esteem, in risky behaviors, as well as hyperreligiosity and hypersexuality." He noted that as recently as two weeks before coming to San Bernardino for the hearing, appellant "thought he was God, as he usually does." He testified that appellant's condition was not in remission and that he had no doubt that appellant would stop taking his medications as soon as he was released and that he would pose a danger to the public. Although he acknowledged that appellant's violent behavior had decreased since he had been placed on lithium, he was still symptomatic. Dr. Steed concluded that appellant posed a substantial danger to others as a result of his mental disorder.

The prosecution called appellant to testify. Much of his testimony was confused or nonresponsive, but he ultimately admitted that he had a mental disorder and that his disorder made him dangerous.

LEGAL ANALYSIS

1.

THE APPEAL IS MOOT

A case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief. (*People v. Gregerson*, *supra*, 202 Cal.App.4th at p. 321.) By the nature of MDO proceedings, in which a new commitment order must be sought every year, issues arising in such proceedings can most often not be decided on appeal quickly enough to provide any relief to the person committed. That is the case

6

here. Appellant's current commitment order expired on January 20, 2016, while this appeal was pending. A new petition for recommitment was filed on June 22, 2015, and was denied on March 7, 2016, based on the trial court's finding that appellant no longer meets the criteria for commitment as an MDO.[6] A reversal of appellant's current commitment order would have no effect on the pending petition. However, it is appropriate to address the issues raised in this appeal because they are important legal issues that are likely to reoccur "'while evading appellate review . . . .' [Citation.]" (*People v. Gregerson*, at p. 321.) Accordingly, we have chosen to address these issues, but we will dismiss the appeal as moot. (*Ibid.*)

2.

EQUAL PROTECTION

*Background.*

Under both the United States and California Constitutions, a person has the right to refuse to answer potentially incriminating questions put to him or her in any proceeding; in addition, the defendant in a criminal proceeding enjoys the right to refuse to testify at all. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) Commitment proceedings involving NGI's, SVP's and MDO's are all civil in nature. (*Hudec v.*

---

[6] We take judicial notice of the pending petition in *People v. Dunley*, filed June 22, 2015, in the Superior Court of San Bernardino County, case No. FELJS1502150. (Evid. Code, § 452, subd. (d).) By separate order, we have also taken judicial notice of the trial court's minutes dated March 7, 2016, denying the petition.

*Superior Court*, *supra*, 60 Cal.4th at p. 819 (*Hudec*) [NGI]; *People v. Leonard* (2000) 78 Cal.App.4th 776, 789-793 [SVP]; *People v. Montoya* (2001) 86 Cal.App.4th 825, 830 [MDO], overruled on another point in *People v. Blackburn* (2015) 61 Cal.4th 1113, 1131; § 2972, subd. (a) [MDO commitment hearing is a civil hearing].)  Accordingly, none of the three groups has a right emanating from the Fifth Amendment or article I, section 15 of the California Constitution to refuse to testify in commitment proceedings.  (See *Hudec*, at p. 819 & fn. 2.)[7]

In *Hudec*, *supra*, 60 Cal.4th 815, the California Supreme Court resolved a split of authority as to whether NGI's have a statutory right not to be compelled to testify.  The court held that section 1026.5(b)(7), which incorporates into an NGI commitment extension proceeding "'the rights guaranteed under the federal and State Constitutions for criminal proceedings,'" provides that a defendant may not be compelled to testify in NGI commitment proceedings.  (*Hudec*, at pp. 819-832.)

In *People v. Curlee*, *supra*, 237 Cal.App.4th 709 (*Curlee*), the court concluded that SVP's and NGI's are similarly situated "for purposes of whether they may be compelled to testify at their commitment hearings."  (*Curlee*, at pp. 720-721.)  Accordingly, it held, unless the People can justify disparate treatment, equal protection principles mandate that the statutory right not to testify in a commitment proceeding provided for in

---

[7]  As in *Hudec*, *supra*, 60 Cal.4th 815, appellant does not contend that he has such a right.  He relies entirely on section 1026.5(b)(7) and equal protection principles.

section 1026.5(b)(7) applies to SVP's as well as to NGI's.  It remanded the matter for an evidentiary hearing for the purpose of allowing the People to show that differential treatment of NGI's and SVP's is justified.  (*Curlee*, at pp. 721-723.)  Relying in part on *Curlee*, appellant contends that MDO's are similarly situated with respect to NGI's and SVP's for the purpose of the testimonial privilege.[8]

*The Claim is Not Forfeited.*

We first address the Attorney General's contention that review of the issue is forfeited because at the hearing, appellant did not assert a right not to testify.  We acknowledge that an equal protection claim may be forfeited if it is raised for the first time on appeal.  (*Curlee*, *supra*, 237 Cal.App.4th at p. 714.)  However, we will exercise our discretion to address the issue because at the time of the hearing, in December 2014, published authority from this court held that section 1026.5(b)(7) does not confer a testimonial privilege on NGI's and, therefore, also rejected a contention that equal protection mandates extension of that right to MDO's.  (*People v. Lopez* (2006) 137 Cal.App.4th 1099, 1106-1116, disapproved in part in *Hudec*, *supra*, 60 Cal.4th at p. 832, fn. 5.)  Other appellate courts had held that NGI's do have a statutory right to refuse to testify and, in January 2015, one month after appellant's hearing, the California Supreme

_____

[8] *Curlee*, *supra*, 237 Cal.App.4th 709, was decided in May 2015, very shortly after appellant filed his opening brief in this case.  The Attorney General, whose brief was filed six months later, in November 2015, does not address *Curlee*.  Appellant discussed *Curlee* in his reply brief.  The Attorney General has not sought to provide supplemental briefing concerning the effect of *Curlee* on this case.

9

Court resolved the issue as described above.  (*Hudec*, at pp. 822-825.)  However, in December 2014, it would not have been unreasonable to assume that an objection would have been futile, based on *People v. Lopez.*  We do not require parties to make futile objections.  (*Curlee*, at p. 715.)  Moreover, the threshold equal protection issue we decide in this appeal is a question of law and does not require resolution of disputed factual issues.  Such an issue can be raised for the first time on appeal.  (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6.)

*MDO's, SVP's and NGI's are Similarly Situated for Purposes of the Testimonial Privilege Under Section 1026.5(b)(7).*

 ""The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." [Citation.]  In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws." (*People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*).)

In contexts other than the testimonial privilege, NGI's, SVP's and MDO's have been found similarly situated for purposes of the application of the three commitment schemes, thus requiring justification for any differential treatment.  In *McKee*, *supra*, 47

10

Cal.4th 1172, the court addressed the contention that the SVP scheme then in effect, which imposed indefinite commitments and required SVP's to bear the burden of proving at periodic review hearings that they should be released, violated equal protection because it placed a greater burden on SVP's than on MDO's. Under the MDO commitment scheme, the state bears the burden of proving beyond a reasonable doubt that the person should be recommitted for another year. (*McKee*, at pp. 1183-1184, 1202.)

After noting the "incontrovertible point that SVP's and MDO's do not share identical characteristics," the *McKee* court held: "We conclude that MDO's and SVP's are similarly situated for our present purposes. As was stated in *In re Calhoun* (2004) 121 Cal.App.4th 1315 [18 Cal.Rptr.3d 315], in which the court struck down a policy that granted to SVP's a more restricted right to refuse antipsychotic medication than MDO's, both MDO's and SVP's 'have been found, beyond a reasonable doubt, to suffer from mental disorders that render them dangerous to others. The dangerous finding requires only an assessment of future dangerousness. It does not require proof of a recent overt act. Both have been convicted of a serious or violent felony. At the end of their prison terms, both have been civilly committed to the Department of Mental Health[9] for treatment of their disorders. Furthermore, the purpose of the MDO Act and the SVPA is

---

**9** Now the State Department of State Hospitals. (*Curlee*, *supra*, 237 Cal.App.4th at p. 712, fn. 2.)

the same: to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' ([*Calhoun*,] at pp. 1351-1352, accord *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1156 [88 Cal.Rptr.2d 696] (*Buffington*) [concluding that SVP's and MDO's are similarly situated because 'they are currently suffering from a mental disorder that renders them dangerous']; *People v. Gibson* (1988) 204 Cal.App.3d 1425, 1436 [252 Cal.Rptr. 56] [an MDO is similarly situated to other adult persons involuntarily committed because '[o]ne purpose of all of these pertinent involuntary commitment schemes is the protection of the public from the dangerous mentally ill and their involuntary commitment for treatment'].) We agree that these common features make SVP's and MDO's similarly situated. *Therefore, when the state makes the terms of commitment or recommitment substantially less favorable for one group than the other, the case law reviewed above teaches that it is required to give some justification for this differential treatment.*" (*McKee*, *supra*, 47 Cal.4th at p. 1203, italics added.)

The *McKee* court went on to hold that NGI's and SVP's are also similarly situated for purposes of the civil commitment schemes. The court stated: "McKee argues that NGI's and SVP's are also similarly situated and that a comparison of the two commitment regimes raises similar equal protection problems as discussed above. His argument has merit. NGI's as discussed are those who have committed criminal acts but have been civilly committed rather than criminally penalized because of their severe mental disorder. Under the current statutory scheme they may not be in civil custody

12

longer than the maximum state prison term to which they could have been sentenced for the underlying offense [citations] unless at the end of that period the district attorney extends the commitment for two years by proving in a jury trial beyond a reasonable doubt that the person presents a substantial danger of physical harm to others because of a mental disease, defect, or disorder. [Citations.] We agree that, as with MDO's, the People have not yet carried their burden of justifying the differences between the SVP and NGI commitment statutes." (*McKee*, *supra*, 47 Cal.4th at p. 1207.)

In *Curlee*, *supra*, 237 Cal.App.4th 709, the court held that for purposes of the testimonial privilege in commitment proceedings, SVP's and NGI's are similarly situated. Citing, inter alia, *McKee*, *supra*, 47 Cal.4th 1172, the court stated: "The preconditions to commitment are similar: Both groups have committed a criminal act and have been found to suffer from a mental condition that might present a danger to others. [Citation.] At the end of the SVP's prison term, and at the end of the term for which an NGI could have been imprisoned, each is committed to the state hospital for treatment if, at the end of that period, the district attorney proves in a jury trial beyond a reasonable doubt that the person presents a danger to others as a result of a mental disease, defect, or disorder. [Citations.] The purpose of the commitment is the same: To protect the public from those who have committed criminal acts and have mental disorders and to provide mental health treatment for the disorders. [Citations.]" (*Curlee*, at p. 720.)

13

In this case, the Attorney General contends that NGI's are not similarly situated with respect to MDO's or SVP's because an NGI defendant asserts his mental disorder as an affirmative defense in his criminal trial and is, therefore, found not culpable as a result of the disorder. She notes that a defendant bears the burden of proof on the NGI defense. (See § 25, subd. (b).) In contrast, in both MDO and SVP proceedings, a defendant has been found guilty of a qualifying offense and after having served his or her sentence, is found to qualify for civil commitment in a proceeding in which the prosecution bears the burden of proof as to the existence of a mental disorder that renders that defendant a danger to the public. We fail to see how these distinctions are relevant to the determination as to whether the three groups are similarly situated for purposes of the testimonial privilege, however. Based on the reasoning of *McKee*, *supra*, 47 Cal.4th at page 1202, and *Curlee*, *supra*, 237 Cal.App.4th at pages 720 through 721, we can see no distinction between MDO's and either SVP's or NGI's for purposes of the testimonial privilege. Accordingly, we hold that for that purpose, MDO's, NGI's and SVP's are similarly situated.

*Disparate Treatment*.

If two groups are found to be similarly situated for the purposes of the law in question, the next inquiry is whether the state can justify the disparate treatment. (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.) One of two tests applies in a given case: either the rational basis test or the strict scrutiny test. The rational basis test applies when the statute involves neither a suspect class nor a fundamental right. That test

14

requires only that there is "'""any reasonably conceivable state of facts that could provide a rational basis for the classification."'" [Citation.]" (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) If the statute does affect a fundamental right, strict scrutiny applies. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20 (*Hubbart*).) "'[O]nce it is determined that [a] classification scheme affects a fundamental interest or right the burden shifts; thereafter *the state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are *necessary* to further that purpose.' [Citations.]" (*People v. Saffell* (1979) 25 Cal.3d 223, 228 (*Saffell*).)

The Attorney General contends that the rational basis test applies in this case. In our original opinion, we held that, on the contrary, the proper standard is strict scrutiny. We based this holding on *Hubbart*, *supra*, 19 Cal.4th 1138, and other cases in which the California Supreme Court has held that strict scrutiny applies to equal protection challenges to civil commitment schemes because those schemes affect the individual's fundamental liberty interest. (*Id.* at p. 1153, fn. 20; *McKee*, *supra*, 47 Cal.4th at p. 1203 [involuntary commitment schemes impact individual's fundamental liberty interest], 1210 [strict scrutiny applies].) In a petition for rehearing, the Attorney General contended that this conclusion is erroneous and that we "unwarrantedly expand[ed] *McKee*'s holding." She contends that *McKee* holds that strict scrutiny does not apply to "every detail" of civil commitment schemes. She contends that the testimonial privilege is merely a statutory trial right and not a matter affecting a fundamental interest, and that

15

strict scrutiny therefore does not apply. We granted rehearing to address these contentions.

The California Supreme Court has long held that under California law, equal protection challenges to involuntary civil commitment schemes are reviewed under the strict scrutiny test because such schemes affect the committed person's fundamental interest in liberty. (*Hubbart*, *supra*, 19 Cal.4th at p. 1153, fn. 20 and cases cited therein.)[10] The court reiterated that holding in *In re Smith* (2008) 42 Cal.4th 1251, 1263: "Under California law, '"[s]trict scrutiny is the appropriate standard against which to measure [equal protection] claims of disparate treatment in civil commitment. [Citations.]"' [Citation.]" Up to that point, the court had never, in any case of which we are aware, stated any limitations on that rule. The Attorney General contends that in *McKee*, *supra*, 47 Cal.4th 1172, however, the court did hold that equal protection challenges to some minor aspects of a civil commitment scheme are not subject to strict scrutiny.

---

[10] The court distinguished federal law in this respect, noting that the United States Supreme Court has "suggest[ed] a willingness" to accord substantial deference to involuntary civil commitment laws challenged under the federal Constitution. (*Hubbart*, *supra*, 19 Cal.4th at p. 1153, fn. 20.) The court then stated that in contrast, California "has traditionally subjected involuntary civil commitment statutes to the most rigorous form of constitutional review." (*Ibid*.) Here, appellant relies on both the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution.

16

In *McKee*, *supra*, 47 Cal.4th 1172, in an equal protection challenge to amendments to the SVP act, the court rejected in a footnote the suggestion by the concurring and dissenting justice that it was holding that strict scrutiny applies to "'every detail of every civil commitment program.'" (*McKee*, at p. 1210, fn. 13.) In the same footnote, however, the court went on to say, "Nor do we agree with the concurring and dissenting opinion inasmuch as it means to imply that the change from a short-term commitment, renewable only if the state carries its burden beyond a reasonable doubt, to an indefinite commitment in which the person committed has the burden of proof is merely an alteration of a minor detail of the commitment scheme." (*Ibid.*) Thus, the court referred to the concurrence and dissent only for the purpose of rejecting any implication that the issues before it in that case could be deemed to be mere "details" of the SVP act. The court's rejection of the concurring and dissenting justice's characterization of its holding, is not, of course, the equivalent of actually holding that strict scrutiny does not apply to some details of the SVP act or other involuntary civil commitment statutes. Moreover, in *McKee*, the court reiterated its earlier holding in *Conservatorship of Hofferber* (1980) 28 Cal.3d 161 (*Hofferber*) that "fundamental distinctions between classes of individuals subject to civil commitment are subject to strict scrutiny." (*McKee*, at p. 1210, citing *Hofferber*, at p. 171, fn. 8.) Accordingly, the Attorney General's contention is simply erroneous.

We also reject the Attorney General's assertion that in *McKee*, the court held that "because" the challenged law increased the length of an SVP's commitment and placed

17

the burden on the SVP to prove eligibility for release, strict scrutiny applies.  Nowhere does *McKee* state that strict scrutiny applies for any reason other than because the challenged law affects the liberty interests of the individuals who are subject to it.  (*McKee*, *supra*, 47 Cal.4th at pp. 1203-1204 [liberty interest], 1210 [strict scrutiny].)  Opinions are not authority for propositions that were not raised and decided.  (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155.)

The Attorney General asserts that in other cases, the Supreme Court has held that only challenges to "the duration of an MDO's commitment such that it infringes upon either his liberty or freedom [and] substantive definitional standards and burdens of proof, which affect the criteria used to determine whether a person is subject to commitment" are subject to strict scrutiny review.  The cases she cites are *In re Moye* (1978) 22 Cal.3d 457 (*Moye*),[11] *Hofferber*, *supra*, 28 Cal.3d 161, and *Hubbart*, *supra*, 19 Cal.4th 1138.  This contention, too, is erroneous.

In *Moye*, *supra*, 22 Cal.3d 457, the issue was whether a person who is committed to the Department of Health following his acquittal of criminal charges because of insanity can be held in the department's custody for a period in excess of the maximum term provided for the underlying offense of which he was acquitted.  (*Id*. at p. 460.)  In *Hofferber*, *supra*, 28 Cal.3d 161, the issue was whether a person who had been charged

---

[11]  *Moye, supra*, 22 Cal.3d 457, was superseded in part by the enactment of section 1026.5.  (*Hudec*, *supra*, 60 Cal.4th at pp. 821-822.)

18

with a violent crime but found incompetent to stand trial was subject to civil commitment "for reasons and under procedures that differ from those applicable to other mentally disordered persons."[12] (*Id*. at p. 167.) In *Hubbart*, *supra*, 19 Cal.4th 1138, the issue was whether the criteria used for determining eligibility for civil commitment under the SVP act violated due process or equal protection. (*Id.* at pp. 1151-1167 [due process], 1168-1170 [equal protection].) However, in none of those cases did the court address a contention that strict scrutiny applied *because* of the particular aspect of the civil commitment scheme that was at issue, nor did it so hold. In *Moye*, the court merely stated, "Because petitioner's personal liberty is at stake, the People concede that the applicable standard for measuring the validity of the statutory scheme now before us requires application of the strict scrutiny standard of equal protection analysis. Accordingly, the state must establish both that it has a 'compelling interest' which justifies the challenged procedure and that the distinctions drawn by the procedure are necessary to further that interest. [Citation.]" (*Moye*, at p. 465.) Similarly, in *Hofferber*, the applicable standard was not in issue. The sole reference to it is in a footnote, where the court stated, "The conservator concedes that, because a fundamental liberty interest is at stake, strict scrutiny is the correct standard of review." (*Hofferber*, at p. 171, fn. 8.) In *Hubbart*, the court merely noted in a footnote that it "has traditionally subjected

---

[12] The former Mentally Disordered Sex Offenders Act (Welf. & Inst. Code, former section 6300 et seq.) is the forerunner of the current SVP act. (*McKee*, *supra*, 47 Cal.4th at p. 1196.)

19

involuntary civil commitment statutes to the most rigorous form of constitutional review." (*Hubbart*, at p. 1153, fn. 20.) Accordingly, we reject the suggestion that those cases stand for the proposition that only certain types of issues arising through equal protection challenges to civil commitment statutes are subject to strict scrutiny. The dictum in *McKee*, *supra*, 47 Cal.4th 1172, on which the Attorney General relies, does not affect the court's existing holdings. We, of course, are bound by the court's directly applicable holdings. (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

For the same reason, we reject the Attorney General's assertion that denial of the statutory right not to be compelled to testify is not subject to strict scrutiny because it "touches on only a *single* procedural aspect of the trial," and is therefore merely a trial error, as opposed to structural error, within the meaning of *Arizona v. Fulminante* (1991) 499 U.S. 279.[13] She is correct that denial of a purely statutory trial right is subject to the least stringent standard of reversal, i.e., that of *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Epps* (2001) 25 Cal.4th 19, 29.) That is not, however, relevant to the question of what standard of review applies for purposes of equal protection. In the context of equal protection, the test for the application of strict scrutiny is whether the civil

___

[13] In *Arizona v. Fulminante*, *supra*, 499 U.S. 279, the court distinguished between federal constitutional errors that are "structural" and require automatic reversal of a criminal conviction because they affect the "framework within which the trial proceeds," from "trial errors" occurring during the trial. Trial errors are subject to harmless error analysis. (*Id.* at pp. 306-310.)

commitment scheme itself affects personal liberty, not whether a particular aspect of the act is the equivalent of structural error.

For these reasons, we reject the Attorney General's contentions on rehearing and reiterate that strict scrutiny applies to the determination whether the testimonial privilege provided for in section 1026.5(b)(7) applies to MDO proceedings.[14]

3.

## REVIEW OF THE ASSERTED INSTRUCTIONAL ERROR IS FORFEITED[15]

Appellant appears to assert that the trial court erred by failing to instruct the jury on the burden of proof with respect to his medicated state, i.e., whether he is in remission because his symptoms are controlled by his current medication. That is, at least, what the heading of his argument states. He relies on *People v. Noble* (2002) 100 Cal.App.4th 184 (*Noble*). Upon further examination, however, appellant's actual contention is that the trial court erred by failing to give an instruction suggested in dictum by the court in *Noble*. (*Id*. at p. 190.) The suggested instruction does not relate to the actual issue in

---

[14] The Attorney General has not identified a compelling state interest which would support different treatment for MDO's with respect to the testimonial privilege. In both *McKee*, *supra*, 47 Cal.4th 1172 and *Curlee*, *supra*, 237 Cal.App.4th 709, the courts remanded the matters for an evidentiary hearing to allow the state the opportunity to establish a factual basis justifying the disparate treatment of the affected groups. (*McKee*, at pp. 1208-1211; *Curlee*, at pp. 722-723.) Because we are dismissing the instant appeal as moot, however, that issue must be litigated in some future case.

[15] See footnote 4, *ante*.

*Noble*, which is that the court gave an instruction that impermissibly shifted the burden of proof. (*Id*. at pp. 188-190.)

The issue in *Noble* is as follows. In that case, the trial court in an MDO proceeding first instructed the jury: "'It is the burden of the prosecution to prove beyond a reasonable doubt that the defendant meets the requirements for a hospital extension as defined in these instructions.' It then instructed the jury to determine whether defendant, 'by reason of a mental disorder, not at this time in remission, represents a substantial danger of physical harm to others. [¶] The People have the burden of proving beyond a reasonable doubt that the respondent [defendant]: [¶] 1. Has a severe mental disorder; [¶] 2. Suffers from a severe mental disorder that is not in remission or cannot be kept in remission if the person's treatment is not continued; and [¶] 3. By reason of his severe mental disorder, the respondent [defendant] represents a substantial danger of physical harm to others.' Quoting the statutory definition of the term, the trial court also instructed the jury that '"remission" means a finding that the overt signs and symptoms of the severe mental disorder are controlled either by psychotropic medication or psychosocial support. . . .'" (*Noble*, at p. 189.)

The jury was further instructed in terms of CALJIC No. 4.15 as follows: "'It is a defense to a Petition to Extend Commitment that the respondent [defendant] in a medicated state does not represent a substantial danger of physical harm to others. [¶] The . . . [defendant] has the burden of proving by a preponderance of the evidence all of the facts necessary to establish: [¶] 1. In his present medicated condition he no longer

22

represents a substantial danger of inflicting physical harm upon others; and [¶] 2. He will continue to take the medication as prescribed, in an unsupervised environment. [¶] If you find that the respondent [defendant] has met this burden on these issues, you should find that he does not represent a substantial danger of physical harm to others.'" (*Noble*, *supra*, 100 Cal.App.4th at p. 189.)

The appellate court held that giving CALJIC No. 4.15 was erroneous because the so-called "medication defense," i.e., the defense that the person is in remission because his medication controls his mental disorder and renders him not dangerous is not an affirmative defense. Rather, it is a defense that negates an element of the state's case, in that the state has the burden of proving that the person is *not* in remission. An affirmative defense is one which does not negate an essential element of a cause of action or charged crime, but instead presents new matter to excuse or justify conduct that would otherwise lead to liability. (*Noble*, *supra*, 100 Cal.App.4th at p. 189.) "Where a 'defense' negates an essential element of the crime charged rather than introducing new matter . . . 'the state may not constitutionally place the burden of persuasion on that issue upon the defendant.' [Citation]." (*Ibid*.) Accordingly, the court held, the trial court erred in giving CALJIC No. 4.15. (*Noble*, at pp. 189-190.)

The court then stated in dictum that when a defendant relies on the medication defense, the court should instruct the jury as follows: "The People have the burden to prove, beyond a reasonable doubt, that if released, the defendant will not take his or her

prescribed medication and in an unmedicated state, the defendant represents a substantial danger of physical harm to others." (*Noble*, *supra*, 100 Cal.App.4th at p. 190.)

Here, the trial court did not give an instruction shifting the burden of proof to appellant on the medication defense. Instead, it instructed on the state's burden using CALCRIM No. 3457. That instruction explains that the state must prove that the person has a severe mental disorder that is not in remission or that cannot be kept in remission without continued treatment and, as a result, the person poses a substantial danger of physical harm to others. It defines "remission" as meaning that "the external signs and symptoms of the severe mental disorder are controlled by either psychotropic medication or psychosocial support." (CALCRIM No. 3457.)

Appellant relied on the medication defense in the hearing and presented evidence that he had not engaged in any violence since he began taking lithium. He requested a special instruction in the language suggested in *Noble*, *supra*, 100 Cal.App.4th at page 190. The court denied the request, saying that the requested instruction was adequately covered by CALCRIM No. 3457.

Appellant now contends that this was error, because the jury might have been confused by CALCRIM No. 3457. He contends that the instruction may be confusing or

24

misleading, "[d]epending on the jury's understanding of the word 'treatment.'"[16] If the jury understood "treatment" to mean "medication," he contends, the instruction's definition of remission "would have made no sense, and the jury would have been confused." Appellant did not, however, make that argument in the trial court. Rather, his attorney merely stated that he was requesting the *Noble* instruction because an appellate attorney had taken him to task in a prior case for failing to request the instruction. Even after the jury submitted a question asking for clarification about remission, defense counsel merely suggested that the *Noble* instruction "might be appropriate in light of the question."[17] He did not make the assertion appellant now makes, i.e., that CALCRIM No. 3457 is confusing because it does not define "treatment." The *Noble* instruction in no way clarifies the meaning of "treatment," however. Rather, it addresses the People's burden "to prove, beyond a reasonable doubt, that if released, the defendant will not take his or her prescribed medication and in an unmedicated state, the defendant represents a substantial danger of physical harm to others." (*Noble*, *supra*, 100 Cal.App.4th at p. 190.) Failure to request clarifying language where an instruction is otherwise correct forfeits review. (*People v. Maury* (2003) 30 Cal.4th 342, 425-426, disapproved on other

---

[16] Appellant's argument initially appears to be that CALCRIM No. 3457 was confusing, depending on how the jury understood the word "treatment." However, as we discuss, this is not actually the gist of his argument.

[17] "1. Is substantial danger of physical harm to others; are we to consider the fact if he is medicated or not? [¶] 2. Also, will Mr. Dunley be given a social worker when released?"

25

grounds in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901.)  Accordingly,

appellant's claim was not preserved for review.

DISPOSITION

The appeal is dismissed.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER_____

J.

We concur:

RAMIREZ_____
P. J.

HOLLENHORST_____
J.