Filed 5/21/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of J.Y. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY, <br><br> Petitioner and Respondent, <br> v. <br> J.Y., <br><br> Objector and Appellant. | A157323 <br><br> (Contra Costa County Super. Ct. No. P0400120) |

Appellant J.Y. appeals from the trial court's order reappointing respondent Contra Costa County Public Guardian conservator of her person pursuant to the Lanterman-Petris-Short Act (LPS) Act (Welf. & Inst. Code, § 5000 et seq.).[1]  On appeal, appellant contends that compelling her to testify as a witness against herself at the trial for reappointment of respondent as her conservator violated her state and federal equal protection rights, given that the right to refuse to testify has been statutorily granted to persons found not guilty by reason of insanity (NGI) in proceedings to extend their civil commitment.  We agree with appellant that LPS conservatees are similarly situated to NGI's, as well as individuals subject to other involuntary civil commitments, for purposes of the right against compelled testimony,

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

considering the serious liberty interests at stake in all such involuntary civil commitments. We also find that respondent has not yet offered a compelling reason why LPS conservatees' procedural protections should not include the right against compelled testimony. However, because appellant's one-year conservatorship has terminated, we will dismiss the appeal as moot.

## BACKGROUND

Respondent was first appointed temporary conservator of appellant's person on February 6, 2004. Thereafter, an order appointing respondent as conservator of appellant's person was entered on January 13, 2005, and an order continuing her conservatorship was entered on March 21, 2005.

Orders reappointing respondent conservator of appellant's person were entered 12 times between January 2006 and December 2017.

In the present matter, respondent filed a petition for reappointment as conservator of appellant's person on November 13, 2018. Appellant objected to the reappointment and requested a jury trial. Appellant further objected to respondent calling her as a witness at trial, arguing that such compelled testimony would violate her due process and equal protection rights. The court overruled the objection, finding that *Conservatorship of Baber* (1984) 153 Cal.App.3d 542, "clearly indicates that, number one, these are civil proceedings not criminal. There is not a Fifth Amendment right as in criminal proceedings. That's part of what the trier of fact has to observe, that is, the physical and also mental presentation that the proposed conservatee, respondent, exhibits [*sic*]. So that is something that has to be considered by the trier of fact." The court further stated, however, "that does not prevent the assertion of a Fifth Amendment right if a question calls for something that could incriminate [appellant] in a criminal proceeding."

2

A jury trial was held in April 2019, at which appellant testified in respondent's case in chief. Two other witnesses also testified for respondent. Psychiatrist Michael Levin, who had interviewed appellant twice, testified as an expert in the areas of psychiatry and grave disability. Dr. Levin opined that appellant suffered from schizophrenia and was gravely disabled. Andrew Smith, a licensed psychologist and deputy conservator who had worked with appellant since February 2018, testified as an expert in the area of grave disability. Dr. Smith also opined that appellant was gravely disabled.

At the conclusion of trial, the jury found that appellant was gravely disabled due to a mental disorder, and the court entered an order reappointing respondent as conservator of appellant's person. The court then imposed special disabilities depriving appellant of the rights to (1) refuse treatment related to her grave disability or general health, (2) enter into contracts, and (3) possess or own firearms. The court also designated appellant's current placement in a skilled nursing facility, where she had lived for 10 years, as the least restrictive alternative placement.

On May 13, 2019, appellant filed a notice of appeal.

## DISCUSSION

Appellant contends that compelling her to testify as a witness against herself at the trial for reappointment of respondent as her conservator violated her state and federal equal protection rights, given that the right to refuse to testify has been statutorily granted to NGI's in proceedings to extend their civil commitment.

### I. *Mootness*

As a preliminary matter, appellant observes that because her one-year conservatorship terminated on December 15, 2019, while this appeal was

3

pending, her appeal is now technically moot.  At our request, the parties have submitted recent documents from the trial court record that were not in the record on appeal, showing that on December 19, 2019, respondent filed a petition for reappointment as conservator; on January 28, 2020, the parties stipulated to a continuance until February 18, 2020; and that on February 18, 2020, the trial court continued the matter for one month, until March 17, 2020, stating that "the proposed conservatee is not accepting the reappointment and wants to wait on the outcome of the appeal on the disposition of the prior petition."[2]

Appellant asks that we exercise our discretion to address the equal protection issue she raises, based on the continuing public importance of the issue, its likely continuing impact on her, as well as the inherent difficulty of resolving such an appeal before the expiration of a one-year conservatorship. For the reasons stated by appellant, we will exercise our discretion to address the issue on the merits.  (See *People v. Alsafar* (2017) 8 Cal.App.5th 880, 883 (*Alsafar*) [finding equal protection issue moot, but addressing it on merits because it "is a legal issue of continuing public importance . . . and is a question capable of repetition, yet evading review"]; *People v. Dunley (*2016) 247 Cal.App.4th 1438, 1445 (*Dunley*) [same].)[3]  However, because a reversal

_____

[2] On our own motion, after affording the parties the opportunity to comment at oral argument, we take judicial notice of the documents from the trial court record—the ongoing case report and a January 28, 2020 minute order—that the parties have submitted.  (See Evid. Code, §§ 452, subd. (d), 459.)

[3] We observe that two appellate courts have recently published opinions addressing the identical equal protection issue appellant raises here.  (See *Conservatorship of E.B.* (2020) 45 Cal.App.5th 986, 988 (*E.B.*); *Conservatorship of Bryan S.* (2019) 42 Cal.App.5th 190, 195 (*Bryan S.*), review den. Mar. 11, 2020.)  Because the courts in these two cases have

4

would have no practical effect on the present appeal, we will dismiss it as moot. (See *Alsafar*, at p. 883; *Dunley*, at p. 1445.)

## II. *The LPS Act*

The LPS Act affirms that "[p]ersons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution of the State of California, unless specifically limited by federal or state law or regulations." (§ 5325.1.) Moreover, "[n]o person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder . . . , regardless of whether such evaluation or treatment was voluntarily or involuntarily received." (§ 5331; see *In re Qawi* (2004) 32 Cal.4th 1, 17 [" 'one of the cardinal principles of LPS,' [is] 'that mental patients may not be presumed incompetent solely because of their hospitalization' "; see also § 5000; *Conservatorship of Early* (1983) 35 Cal.3d 244, 253].)

Under the LPS Act, a conservator may be appointed "for a person who is gravely disabled as a result of a mental health disorder . . . . (§ 5350.) "Gravely disabled" is defined as, inter alia, "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)[4]

reached opposite conclusions on the equal protection question, we believe it is valuable to address the merits in this case, regardless of mootness.

[4] A person found gravely disabled under section 5008, subdivision (h)(1)(A), must be placed "in the least restrictive alternative placement, as designated by the court." (§ 5358, subd. (a)(1)(A).) The conservatorship "shall automatically terminate one year after the appointment of the conservator," although, if the conservator determines that an additional period of conservatorship is still required, he or she may petition the trial court for reappointment as conservator for a succeeding one-year period. (§ 5361.)

5

Under section 5350, subdivision (e)(1), "a person is not 'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic needs for food, clothing, or shelter."

### III. *Equal Protection*

" ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." '  [Citation.]  In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws."  (*People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*).)

"The second step is determining whether there is a sufficient justification for the unequal treatment.  The level of justification needed is based on the right implicated.  When the disparity implicates a suspect class or a fundamental right, strict scrutiny applies.  [Citation.]  When no suspect class or fundamental right is involved, the challenger must demonstrate that the law is not rationally related to any legitimate government purpose. [Citation.]"  (*People v. Flint* (2018) 22 Cal.App.5th 983, 990, citing *People v. Wilkinson* (2004) 33 Cal.4th 821, 836.)

Decisions by our Supreme Court and the United States Supreme Court "have used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or

6

arbitrarily subjected to greater burdens. [Citations.]" (*McKee, supra*, 47 Cal.4th at p. 1199 [citing cases].)

## A. *Disparate Treatment*

"Under both the United States and California Constitutions, a person has the right to refuse to answer potentially incriminating questions put to him or her in any proceeding; in addition, the defendant in a criminal proceeding enjoys the right to refuse to testify at all." (*Dunley, supra*, 247 Cal.App.4th at p. 1446.) Commitment proceedings are civil in nature. (*Ibid.*)

Although there is no constitutional right to refuse to testify in civil proceedings, including LPS commitment proceedings (see *Conservatorship of Baber, supra*, 153 Cal.App.3d at p. 550), in *Hudec v. Superior Court* (2015) 60 Cal.4th 815, 830, 832 (*Hudec*), the California Supreme Court held that NGI's have a *statutory* right, pursuant to Penal Code section 1026.5, subdivision (b)(7), to refuse to testify in civil commitment extension proceedings. The court explained that this right not to testify "does not take its very meaning from the criminal context, nor does applying it when the prosecution seeks to compel the respondent's testimony in an NGI commitment extension hearing present any logical difficulty. . . . 'The right not to be compelled to testify against oneself is clearly and relevantly implicated when a person is called by the state to testify in a proceeding to recommit him or her even if what is said on the witness stand is not per se incriminating.' [Citation.]" (*Hudec*, at p. 830, quoting *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1230.)

After *Hudec*, a number of courts have found that mentally disordered offenders (MDO) and sexually violent predators (SVP) are similarly situated to NGI's under the equal protection clause for purposes of the right against compelled testimony. (See *People v. Flint, supra*, 22 Cal.App.5th at p. 989 [Div. Four of First District found SVP's are similarly situated to NGI's];

7

*Alsafar*, *supra*, 8 Cal.App.5th at p. 887 [Div. Three of Fourth District found MDO's are similarly situated to NGI's]; *People v. Field* (2016) 1 Cal.App.5th 174, 194 [Div. One of Fourth District found SVP's are similarly situated to NGI's and MDO's]; *Dunley*, *supra*, 247 Cal.App.4th at p. 1450 [Div. Two of Fourth District found MDO's are similarly situated to NGI's and SVP's]; *People v. Landau* (2016) 246 Cal.App.4th 850, 864 [Div. Three of Fourth District found SVP's are similarly situated to NGI's]; *People v. Curlee* (2015) 237 Cal.App.4th 709,720 (*Curlee*) [Div. Four of First District found SVP's are similarly situated to NGI's].)

In this case, appellant argues that LPS conservatees, while different from NGI's in many ways, are similarly situated for purposes of whether they may be compelled to testify in conservatorship proceedings. Two recent cases from this District have addressed this precise question, reaching quite different conclusions.

First, in *Bryan S.*, *supra*, 42 Cal.App.5th at page 195, Division One of this District rejected the argument that LPS conservatees are similarly situated to NGI's for purposes of the right not to testify against oneself. While acknowledging that LPS conservatees, NGI's, SVP's, and MDO's are all "subject to involuntary civil commitment as a result of their mental health," the court found more meaningful the fact that "LPS Act conservatees, unlike those facing NGI, SVP, or MDO commitment proceedings, need not have been found to have committed a crime or be a danger to others." (*Id.* at p. 196.) The court found these differences "fatal" to the LPS conservatee's equal protection claim: "As our Supreme Court has explained, there is 'no similarity between the aims and objectives of the [LPS Act] and those of the criminal law. . . . "The commitment is not initiated in response, or necessarily related, to any criminal acts." ' [Citations.] Again, the purpose of

8

civil commitments for NGI's, SVP's, and MDO's is to protect the public from people who have been found to be dangerous to others and who need treatment for a mental disorder. [Citation.] By contrast, the primary purposes of the LPS Act are to provide prompt evaluation and treatment of persons with mental health disorders; to provide such people with individualized treatment, supervision, and placement services; and to encourage the use of all resources to accomplish these objectives. [Citations.] 'We cannot overemphasize the importance of recognizing that a prospective conservatee is not a criminal defendant but, in many cases, a person in dire need of the state's assistance.' [Citation.]" (*Id.* at p. 197, citing inter alia, *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1015, 1019–1020 & *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 543.)

Second, and even more recently, in *E.B.*, *supra*, 45 Cal.App.5th at page 988, Division Five of this District held that "LPS conservatees are similarly situated with NGI's and with individuals subject to other involuntary civil commitments for purposes of the right against compelled testimony." The court reasoned that, "[a]lthough the LPS statute focuses on the prompt evaluation and treatment of person with serious mental disorders without respect to their criminal activities [citation], this does not change the nature of the confinement under its provisions and the resulting deprivation of liberty." (*Id.* at p. 993.)

In this case, we agree with *Bryan S.* that there are differences between LPS conservatees and individuals subject to other involuntary civil commitments, with the latter group having necessarily committed a crime and been found to be dangerous to others. However, we are also mindful that the crucial question for equal protection purposes is whether "two classes that are different in some respects are sufficiently similar with respect to the

9

laws in question to require the government to justify its differential treatment of these classes under those laws." (*McKee, supra*, 47 Cal.4th at p. 1202.) In examining this question, we, like the court in *E.B.*, conclude that LPS conservatees are similarly situated to NGI's and individuals subject to other involuntary civil commitments with respect to the right against compelled testimony, considering that all of these civil committees have in common a potentially lifetime deprivation of liberty. (See *E.B., supra*, 45 Cal.App.5th at p. 1003.)

In *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 225–226 (*Roulet*), which held that the state must prove grave disability beyond a reasonable doubt in LPS conservatorship proceedings, our Supreme Court discussed the "extent to which liberty is at stake" for an LPS conservatee "by reviewing exactly what awaits an individual subjected to a grave disability proceeding" under the LPS Act, and concluding that the applicable "statutes assure in many cases an unbroken and indefinite period of state-sanctioned confinement. 'The theoretical maximum period of detention is *life* as successive petitions may be filed . . . .' [Citation.]" (*Roulet*, at pp. 223–224, 230, fn. omitted [further noting unfair stigma and special threats to reputation attached to grave disability proceedings];[5] cf. *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1314 [rights granted LPS conservatees include " 'right to dignity' " ]; see also *E.B., supra*, 45 Cal.App.5th at p. 1003.)

---

[5] The court in *Roulet* also observed that the "gravely disabled person for whom a conservatorship has been established faces the loss of many other liberties in addition to the loss of his or her freedom from physical restraint," including numerous statutory disabilities, such as those imposed in this case: the rights to refuse or consent to treatment, possess or own firearms, or enter into contracts. (*Roulet, supra,* 23 Cal.3d at p. 228.)

Because we find the analysis in *E.B.* extremely well-reasoned and relevant here, we will quote from it at length in this opinion.  In *E.B.*, the court discussed the similarities between LPS conservatorships and other involuntary civil commitments, explaining that an LPS conservatee "faces an involuntary commitment similar to NGI's (and MDO's and SVP's) even if the reason behind that commitment is more benevolent.  The reasons underlying an LPS commitment, while not identical to civil commitment schemes applicable to those who have been convicted of crimes, overlap with them. The primary purpose of NGI extension proceedings and MDO and SVP commitments is to protect the public from people found dangerous to others and who need treatment for a mental disorder, but an ancillary purpose is to provide mental health treatment for the disorder.  [Citations.]  And, while an LPS conservatee need not be proved dangerous to the public in all circumstances, one purpose of the LPS Act is to 'guarantee and protect public safety.'  (§ 5001, subd. (c).) . . .

"Moreover, many of the same procedural protections apply in a trial to declare someone an LPS conservatee as apply in other proceedings to establish involuntary commitments.  As with NGI extension proceedings, MDO proceedings, and SVP proceedings, a proceeding to declare a conservatorship under the LPS statute requires that the government bear the burden of proof beyond a reasonable doubt, and that the subject of the petition have the right to a jury trial and a unanimous verdict.  [Citations.]" (*E.B.*, *supra*, 45 Cal.App.5th at pp. 994–995, fn. omitted.)

The *E.B.* court then focused specifically on the right against compelled testimony, stating:  "It is not a reasonable distinction to say that individuals who have not engaged in criminal conduct can be required to testify against themselves in a trial to determine whether they might be committed against

11

their will when a person whose commitment is linked to his criminal conduct can elect to remain silent. At least, the nature of the commitment requires a finding that the groups are similarly situated for purposes of requiring the state to justify this disparate treatment.

"The primary benefit of allowing compelled testimony in a case involving involuntary commitments is that it produces a more accurate verdict by allowing the trier of fact to observe firsthand the demeanor of the person the state seeks to commit. [Citations.] This interest in an accurate verdict exists in all involuntary commitment schemes—indeed, it might be argued that the interest is even greater when the mental illness results in the person being a danger to others." (*E.B.*, *supra*, 45 Cal.App.5th at pp. 996–997.)

The *E.B.* court emphasized that the constitutional right with which it was concerned was "equal protection, not the right against compelled testimony. We in no way suggest that the Constitution would preclude an LPS conservatee from taking the stand under protest. But the state has determined to extend the privilege against self-incrimination to persons subject to an NGI extension proceeding, and SVP's and MDO's have been deemed by the courts to be similarly situated. 'MDO, NGI, and LPS proceedings have the same underlying goal—protecting the public and treating severely mentally ill persons. [Citations.] In the LPS context, " '[t]he destruction of an individual's personal freedoms effected by civil commitment is scarcely less total than that effected by confinement in a penitentiary.' " [Citation.] "[T]he gravely disabled person for whom a conservatorship has been established faces the loss of many other liberties in addition to the loss of his or her freedom from physical restraint." [Citation.] "Indeed, a conservatee may be subjected to greater control of his or her life

12

than one convicted of a crime." ' [Citations.]" (*E.B.*, *supra*, 45 Cal.App.5th at p. 996, quoting *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378, 383 & *Roulet*, *supra*, 23 Cal.3d at p. 232; see also *Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, 1249–1250.)

Finally, the court in *E.B.* concluded: "While NGI's, SVP's, and MDO's may have been found guilty of a crime, the purpose underlying those civil commitment schemes is not punishment, but treatment for a mental health condition. [Citations.] LPS conservatees may have a different criminal history than NGI's, MDO's, and SVP's, but at root, like those groups, they are committed against their will for mental health treatment—possibly for the rest of their lives. . . . [B]efore they are asked to be 'agents of their own incarceration,' the state should be required to justify its decision to treat LPS conservatees differently with respect to compelled testimony." (*E.B.*, *supra*, 45 Cal.App.5th at p. 997.)

We likewise conclude that, like MDO's and SVP's, LPS conservatees are similarly situated to NGI's for purposes of the right against compelled testimony because they too are subject to the possibility of "an unbroken and indefinite period of state-sanctioned confinement." (*Roulet*, *supra*, 23 Cal.3d at p. 224.)

## B. *Justification for the Disparate Treatment*

When two groups are found to be similarly situated, the next question is whether the state can justify the disparate treatment. (*Dunley*, *supra*, 247 Cal.App.4th at p. 1450.) "One of two tests applies in a given case: either the rational basis test or the strict scrutiny test." (*Ibid.*)

Respondent concedes that strict scrutiny is applicable in involuntary civil commitment cases, and that the state must establish "that it has a compelling interest that justifies the law." (See *Dunley*, *supra*, 247

13

Cal.App.4th at p. 1451 ["The California Supreme Court has long held that under California law, equal protection challenges to involuntary civil commitment schemes are reviewed under the strict scrutiny test because such schemes affect the committed person's fundamental interest in liberty"].)  Respondent nonetheless argues that the state has a compelling interest justifying the compelled testimony in LPS conservatorship proceedings, and the distinctions or disparate treatment are necessary to further this purpose:  " 'the custodial care, diagnosis, treatment and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community'.  [Citation.]"  (Quoting *Baber*, *supra*, 153 Cal.App.3d at p. 549.)

This argument, however, does not distinguish between the need for truth in LPS conservatorship proceedings and proceedings involving NGI's, MDO's, and SVP's.  Indeed, as the court in *E.B.* observed, the interest in an accurate verdict is arguably greater when a committee's mental illness results in the person being a danger to others.  (*E.B.*, *supra*, 45 Cal.App.5th at pp. 996, 997 [finding that "the public guardian made no showing that appellant's compelled testimony was any more necessary in the proceeding to declare appellant an LPS conservatee than it would have been in other types of civil commitment proceedings"].)  Thus, while we do not disagree that LPS conservatees differ in some ways from those subject to involuntary civil commitments due to their criminal history and dangerousness, respondent has not yet offered a compelling reason why LPS conservatees' procedural protections should not include the right against compelled testimony.

Normally, we would remand the matter to the trial court for an evidentiary hearing to give respondent the opportunity to establish a factual basis justifying the disparate treatment of LPS conservatees and other

14

similarly situated groups subject to involuntary civil commitment. (See *Dunley*, *supra*, 247 Cal.App.4th at p. 1453, fn. 14, citing *McKee*, *supra*, 47 Cal.4th at pp. 1208–1211 & *Curlee*, *supra*, 237 Cal.App.4th at pp. 722–723.) Because we are dismissing the appeal as moot, however, a remand to the trial court on that issue is not appropriate at present. (See *Dunley*, at p. 1453, fn. 14.)[6]

## DISPOSITION

The appeal is dismissed.

---

[6] In light of our dismissal of the appeal, we also will not address respondent's assertion that any error in compelling appellant to testify in its case in chief was harmless under any standard, considering the other competent evidence introduced at trial demonstrating that appellant is gravely disabled.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


*Conservatorship of the Person and Estate of J.Y.* (A157323)

Trial Court:                    Contra Costa County Superior Court

Trial Judge:                    Honorable Susan M. Fenstermacher

Attorney for Appellant:         By appointment of the Court of Appeal Under
                                the First District Appellate Project
                                Jeremy T. Price

Attorneys for Respondent:       Office of the County Counsel
                                Sharon L. Anderson
                                County Counsel

                                Nina F. Dong
                                Deputy County Counsel