Filed 5/28/21  P. v. Montoya CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EVERARDO MONTOYA,<br><br>    Defendant and Appellant. | H047487<br>(Monterey County<br> Super. Ct. No. SS042417A) |

Defendant Everardo Montoya appeals from the trial court's order extending his commitment under Penal Code section 1026.5, subdivision (b).[1]  Defendant had previously been found not guilty by reason of insanity (NGI) and was committed to the Department of State Hospitals.  He was subsequently placed on outpatient status through the South Bay Conditional Release Program (CONREP).  After the People sought an extension of defendant's commitment, a jury found that, "by reason of a mental disease, defect, or disorder," defendant continued to "represent[] a substantial danger of physical harm to others."  (§ 1026.5, subd. (b)(1).)  The trial court ordered defendant's commitment extended for another two years.

On appeal, defendant contends:  (1) the prosecution presented insufficient evidence to support the jury's findings that he represented a substantial danger of physical harm to others and that he had a serious difficulty controlling his dangerous behavior; (2) the jury instruction on extensions of NGI commitments (CALCRIM

---

[1] Unspecified section references are to the Penal Code.

No. 3453) misstated the burden of proof; and (3) the trial court should have granted his motion for a mistrial when a witness volunteered testimony that violated an in limine ruling.

We find substantial evidence supports the jury's findings. We reject defendant's argument that CALCRIM No. 3453 misstates the burden of proof. We find no abuse of discretion in the trial court's denial of a mistrial. We will therefore affirm the order extending defendant's commitment.

## I. BACKGROUND

### A. *Procedural History*

In 2004, defendant was charged with two counts of second degree robbery (§ 211) and one count of battery (§ 242). At some point, two charges of grand theft (§ 487, subd. (c)) were added. After a court trial in 2005, defendant was found guilty of the grand theft charges but NGI of the robbery and battery charges.

In February 2005, defendant was committed to the Department of State Hospitals with his maximum term of confinement set at three years eight months. In 2008, defendant's commitment was extended to May 2010.

In 2009, defendant was placed on outpatient status through CONREP. Defendant thereafter agreed to yearly extensions of his outpatient commitment.

In July 2019, the People filed a petition to extend defendant's outpatient commitment. A jury trial commenced in September 2019, and resulted in a finding that the allegations of the petition were true. The trial court ordered defendant's outpatient commitment extended for two more years.

### B. *Testimony of Defendant's Psychiatrist*

Dr. Nagaraj Uddhandi, a psychiatrist, worked as a consultant with the Harper Medical Group. He began treating defendant in 2018. In his opinion, defendant suffered from schizo-affective disorder, depressive type.

2

Dr. Uddhandi described schizo-affective disorder as "a major mental illness" involving paranoid delusions and, in some cases, auditory hallucinations (i.e., "hearing voices") and disorganized behavior. Schizo-affective disorder is "schizophrenia with more symptoms." People with schizo-affective disorder will often believe that people are after them, and they may "act on those delusions," such as by attacking the person they believe is about to attack.

According to Dr. Uddhandi, schizo-affective disorder does not have a cure but can be managed with medication, psychotherapy, a structured environment, monitoring, and family support. A patient who is medication compliant and has a support system has about a 10 percent likelihood of decompensating.

Dr. Uddhandi explained that decompensation can be triggered by stress, stopping medication, and substance use. Certain medical conditions can also cause decompensation. For instance, if a diabetic has low blood sugar, that can lead to decompensation.

When Dr. Uddhandi began seeing defendant, defendant was taking medication and thus did not display symptoms of schizo-affective disorder. Although the medications were working, defendant reported some side effects, which led Dr. Uddhandi to change one of the medications.

As Dr. Uddhandi continued seeing defendant, he observed two "brief mild depressive episode[s]" and one "paranoid episode." The paranoid episode involved defendant feeling that people were following him. Defendant was "able to recognize" his paranoia, so it was not "too concerning."

In Dr. Uddhandi's opinion, defendant displayed "fair insight about his illness." However, Dr. Uddhandi believed that in order for defendant to be effectively treated, defendant required "continued medication management" and a "continued supervised structured support." If defendant continued with the same treatment and medication he had been receiving, he would have a low risk of violence. However, if he stopped

3

treatment, "his risk might go up." If defendant stopped being medication compliant, he might "lose insight" into his mental illness.

**C.    *Testimony About November 2016 Incident***

Elda Cruz was working in the broccoli fields on November 15, 2016. While taking a break, she noticed defendant approaching. Defendant came up behind Cruz and hit her twice on her back and twice on her head. It appeared that defendant was also going to hit her in the face and kick her, but Cruz's husband intervened. During the incident, defendant was "saying rude things" and gave Cruz and her husband "the finger."

Sheriff's deputies responded to the incident. Defendant was "compliant and quiet" while the deputies investigated. He told the deputies "that he had mental issues and he attacks people on impulse." Based on the comments defendant made, a deputy applied for a 72-hour evaluation of defendant. (See Welf. & Inst. Code, § 5150, subd. (a).)

**D.    *Testimony of Defendant's Caseworker***

Julie Rynearson was a forensic medical health specialist with Harper Medical Group, which contracts with CONREP to provide outpatient services to people found to be NGI. Rynearson had a Master's degree in social work and had achieved the title of associate clinical social worker, which allowed her to diagnose mental health conditions and make treatment recommendations. She testified as an expert in mental health.

Defendant had been a patient of Rynearson's for one year three months. Rynearson initially saw defendant for individual therapy four times per month, but that had gone down to three times per month and then two times per month. Rynearson saw defendant weekly in group therapy. As defendant's case manager, she ensured he had the proper medication and did home visits to ensure he was taking his medication properly.

Patients in CONREP's outpatient program are provided with housing and food, and they have access to support and therapy 24 hours a day, seven days a week. A person is not accepted into outpatient treatment unless he or she has been nonviolent for a year at

4

the state hospital, is medication compliant, and has coping tools.  Substance use issues must be in remission, and the person must be attending 100 percent of their groups at the hospital.

At Harper Medical Group, patients are assigned to a "level system of one through five."  A level one patient is someone who has recently been discharged from the state hospital or jail.  Level one patients receive the most intensive treatment.  Level five patients are at the "discharge level."

When Rynearson began working with defendant, he was at level two, which entails "supportive treatment."  Level two patients are expected to begin to engage in services in the community, such as AA or NA meetings.  Level two patients are also expected to have insight into the "precursors" for their mental illnesses, to have coping tools, and to begin working on a relapse prevention plan.

Defendant had been moved to level three about two months before trial.  His coping tools had started to improve, and he was "starting to work on his trauma more."  Since being moved to level three, defendant had been engaged in cognitive behavioral therapy, to help him change his patterns of thinking.  According to Rynearson, a person usually needs three to six months of cognitive behavioral therapy.  Defendant would be moved to level four when he had progressed to the point of working on discharge.  In level four, he would develop a community wellness plan, which involves finding a therapist and psychiatrist and setting up a way to obtain medication.

Rynearson explained that when someone has trauma, "it raises the symptoms of schizophrenia," making it likely that psychosis will begin.  Coping skills are important because if a person can control his or her emotions, they can prevent psychosis.  Having community resources is important because a person with more support is more likely to stay stable.  For defendant, developing independence was important because he was "codependent," meaning he sought happiness through others instead of himself.  Defendant was also very dependent on his family and the structure of CONREP.

5

Defendant had been permitted to visit his family for three days at a time while he was in outpatient treatment. There had been no issues during those visits. Defendant had been self-administering his medication properly. He was able to use the public bus system by himself.

Defendant had spoken to Rynearson about his delusions. Defendant's more recent delusions were "spiritual and religious," and his past delusions involved a belief that he was "in a relationship with [the] Princess of Monaco."

Defendant had also spoken to Rynearson about his commitment offenses. He expressed "a lot of shame and guilt," and he had some "insight" but not "full insight." Defendant described how he believed that the princess was calling him, how he was trying to get to her, and how he pulled a hair pin off of a college student so he could give the hair pin to the princess. Defendant said he had not been taking his medication properly at the time.

With regard to the 2016 attack on Cruz, defendant described how he had been feeling sick and feeling symptoms of his mental illness—i.e., experiencing hallucinations and hearing voices—but had nevertheless decided to go into town. Voices told defendant that "someone was dangerous," and he believed the people around him were going to hurt him, so he attacked someone. At that point, defendant had been living at home "on a level that was less supervised." Due to his decompensation, he was temporarily readmitted to the state hospital.

Rynearson believed defendant would be a danger to others if he decompensated again. She also believed defendant would have serious difficulty in controlling his behavior if he was not medicated. Although she believed defendant would some day be able to transition back into the community, she did not believe he could do so yet. Defendant needed to continue working on issues such as his self-esteem, his coping mechanisms, his independence, and his medication compliance, because a stressor could cause him "to go into a depressive, isolating mode." Defendant also needed a transition

6

plan that included specific therapists, but he had no plan regarding what he would do if released, other than obtaining a part-time job. Defendant also needed to work through his trauma, which was "continuing to trigger him."

Rynearson explained that although defendant knows how to "report" his hallucinations after the fact, he still did not know "the actions to take." For instance, on one occasion defendant had suffered an upset stomach. He had called CONREP to report the symptom, but he had not asked for any help or treatment. As a result, he had not been able to sleep for most of the night, and he had delusional thoughts.

Rynearson described herself as defendant's "biggest cheerleader" and asserted that she wanted him to succeed in the community. If defendant stayed within CONREP, his risk level for violence was low. If defendant was released to the community, his risk level for violence would rise to moderate.

### E. *Testimony of Defendant's Prior Therapist*

Vanesa Villarreal, a licensed clinical social worker, was the assistant program director at Harper Medical Group. She, too, testified as an expert in mental health.

Villarreal had previously been defendant's primary therapist, and she had performed his assessments during his temporary stay in the state hospital after his attack on Cruz. Defendant had not been able to provide insight into his decompensation at first, but eventually he acknowledged that he had not been compliant with his medication due to financial barriers and the fact that he had shared some medication with a family member.

Villarreal had engaged in recent family meetings with defendant's father, mother, and sister. She did not believe that defendant's family had the ability to support defendant's mental health needs. Although they were "loving and supporting," they would not be able to tell if defendant was having symptoms.

Villarreal was kept apprised of defendant's progress through weekly clinicians' meetings. Villarreal believed that defendant had made "some progress" in his therapy,

7

but that he continued to pose a substantial danger of physical harm to others and that he had serious difficulty controlling his dangerous behavior when he was experiencing psychiatric symptoms. Villarreal believed that defendant still required CONREP's assistance and that it was not yet safe for defendant to be at home, although that was the ultimate goal for him.

## F. *Monterey County Behavioral Health Services*

Melanie Rhodes was a forensic services manager for Monterey County Behavioral Health, which provides services to people with severe mental illnesses. Most clients are on Medi-Cal, but no one is turned away.

## G. *Defendant's Testimony*

Defendant, who was 36 years old at the time of trial, began having psychiatric symptoms of a mental disorder when he was 18 years old and in high school. He ended up in the state hospital for five years and then was released to his family through CONREP.

Defendant suffers from diabetes, for which he takes medication. He was able to get his medication for free from a pharmacy, by himself. He had investigated how much all of his medications would cost if he was not getting them through CONREP; it would cost about $74 per month.

If released from CONREP, defendant planned to stay with his father, his sister, and his brother-in-law. He would remember to take his medication by using a pill box. Defendant considered himself very motivated to continue addressing his mental health. He would live in a calmer environment if he went home. He would engage in treatment through the Monterey County Behavioral Health Department.

Defendant identified his stressors as not being with his family, worrying about paying for the CONREP services, difficulty sleeping, and having delusions. When he has delusions, he reports them to his therapist.

8

Defendant testified that the 2016 incident occurred when he was suffering from pneumonia, a problem with his blood sugar level, and high blood pressure. Defendant had been hearing voices and having delusions. He had taken some, but not all, of his medications, because he had been experiencing side effects. Since that incident, he had been monitoring his blood sugar regularly.

Defendant acknowledged having no therapist or psychiatrist set up outside of CONREP yet. He planned to get his medications from a Wal-Mart in Salinas, which would require him to take a bus or get a ride.

## II.     DISCUSSION

### A.     *Sufficiency of the Evidence*

Defendant contends the prosecution presented insufficient evidence to support the jury's finding that "by reason of a mental disease, defect, or disorder," he "represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).)

#### 1.     *Legal Principles*

Proof that a defendant " 'represents a substantial danger of physical harm to others' " under section 1026.5, subdivision (b) requires proof that the defendant has "a serious difficulty controlling his potentially dangerous behavior." (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159 (*Zapisek*).)

" ' " 'In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5[, subdivision] (b)(1) beyond a reasonable doubt.' " ' " (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.)

" ' " 'Whether a defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others" under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.' . . . [Citation.]"

9

[Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5.' " (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.) "However, 'expert medical opinion evidence that is based upon a " 'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.' " ' " (*People v. Redus* (2020) 54 Cal.App.5th 998, 1011.)

>    2.    *Analysis*

Defendant relies primarily on *In re Anthony C.* (2006) 138 Cal.App.4th 1493 (*Anthony C.*). In that case, the minor was committed to the California Youth Authority after admitting that he had committed a lewd and lascivious act on a child under the age of 14 (§ 288, subd. (a)). (*Anthony C.*, *supra*, at p. 1500.) The minor's commitment was then extended under former Welfare and Institutions Code section 1800, subdivision (a), which required a finding that if discharged from custody, the minor "would be physically dangerous to the public because of [his or her] mental or physical deficiency, disorder, or abnormality which causes [him or her] to have serious difficulty controlling his or her dangerous behavior." (Stats. 2005, ch. 110, § 1.)

The expert testimony in *Anthony C.* came from a psychologist who had worked with the minor in a sex offender treatment program. (*Anthony C.*, *supra*, 138 Cal.App.4th at p. 1500.) The psychologist had diagnosed the minor with pedophilia and attention deficit hyperactivity disorder and had opined that the minor "posed a moderate risk of reoffending upon discharge." (*Id.* at p. 1502.) The psychologist was "unaware of the details" of the minor's sexual offenses, and he was not the person who had prepared the minor's risk assessment. (*Id.* at p. 1506.) The psychologist "was unable to recall many of the relevant risk factors" bearing on the minor's likelihood of reoffending, and he was " 'not sure exactly how high a risk' " the minor posed to the community if released. (*Id.* at p. 1507.)

The *Anthony C.* court found that the psychologist's testimony was "not a basis upon which to establish proof beyond a reasonable doubt." (*Anthony C.*, *supra*, 138 Cal.App.4th at p. 1507.) The court explained: "In light of [the psychologist's] failure to prepare a formal risk assessment evaluation, his lack of preparation, and his inability to state the risk factors at trial, his reluctance to quantify how high a risk [the minor] posed without further study strongly suggests his opinion was based as much on guesswork, surmise or conjecture as on relevant probative facts." (*Ibid.*) Further, the psychologist's conclusion that the minor posed a "moderate risk of reoffense based upon a limited number of risk factors" failed to show that the minor had "serious difficulty controlling his behavior." (*Ibid.*)

The minor's commitment offense and his "confinement behavior" also did not "support a finding of present lack of control." (*Anthony C.*, *supra*, 138 Cal.App.4th at p. 1508.) The commitment offense had been a crime of "opportunity" rather than "a crime of compulsion." (*Id.* at p. 1506.) During his commitment, the minor had fantasies, but he had not acted out on them, leaving "an evidentiary gap whether he lacked control." (*Id.* at p. 1508.)

Defendant asserts that the testimony of Dr. Uddhandi was similar to the psychologist's testimony in *Anthony C.*, because his opinion ignored facts such as defendant's motivation to continue treatment and defendant's current low risk for violence. Defendant also asserts that the opinion testimony of Rynearson ignored similar facts, and that Villarreal's testimony was essentially undermined by the fact that she had not been his primary therapist since 2017—about two years before trial.

The evidence in the instant case is distinguishable from the evidence presented in *Anthony C.* Here, three mental health experts testified; each was able to identify the specific risk factors relevant to defendant's ability to control his behavior. Those risk factors included medication management and compliance, continued therapy, development of coping tools, and development of a relapse prevention plan. The experts

in this case were prepared and able to discuss the specifics of defendant's case, unlike the psychologist in *Anthony C.* The experts in this case also were not relying on someone else's evaluation of defendant, but on their own observations. Even Villarreal, who was no longer defendant's primary therapist, testified that her opinion was based on her "historical knowledge" of defendant as well as what she had "experienced with [him] recently."

The instant case is also distinguishable from *Anthony C.* because defendant had a relatively recent and violent decompensation event during the time he was released to the community. Prior to the decompensation event, defendant had stopped taking his medication. Defendant testified that he stopped taking the medication because he had pneumonia, a blood sugar problem, and high blood pressure, but also because he was experiencing side effects. However, defendant's testimony conflicted with what he had told Villarreal—that he had stopped taking his medication because of financial barriers and because he had shared some of his medication with a family member. Based on this evidence, a reasonable jury could find that defendant had not yet developed sufficient insight about his medication needs and thus find that defendant's behavior during his commitment demonstrated the "present lack of control" lacking in *Anthony C.*, *supra*, 138 Cal.App.4th at page 1508.

Finally, the expert testimony about the quantitative nature of defendant's risk was different from the psychologist's testimony in *Anthony C.* Here, Dr. Uddhandi testified that if defendant was medication compliant and had a support system, he would have about a 10 percent risk of decompensating. Rynearson described defendant's risk of violence if released to the community as "moderate," but she also opined that defendant would be a danger to others and that he would have serious difficulty in controlling his behavior if he was not medication compliant. Villarreal similarly testified that she believed defendant would pose a substantial danger of physical harm to others and that he would have serious difficulty controlling his behavior if he was experiencing psychiatric

12

symptoms. In contrast to the *Anthony C.* psychologist, these opinions were not stated with "reluctance" and they were not primarily based on defendant's commitment offense. (See *Anthony C.*, *supra*, 138 Cal.App.4th at p. 1507.)

The evidence in this case established that defendant was at a significant risk of failing to take his psychiatric medication if he was released from outpatient treatment and supervision. Defendant suffered from a major mental illness that involved delusions and hallucinations, which on two prior occasions had caused him to act violently. Medication compliance was critical to preventing such decompensation. Although defendant testified about his plans to obtain and take his medication upon release, the jury could reasonably find that defendant was not credible. Not only had defendant given conflicting explanations about why he had previously stopped taking his medication, but defendant's own therapist did not believe that defendant had yet developed a transition plan or identified ways to obtain medication if he was released.

On this record, we conclude there was substantial evidence to support the jury's finding that defendant "represent[ed] a substantial danger of physical harm to others" and had "serious difficulty controlling his potentially dangerous behavior." (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1159.) In other words, a rational trier of fact could have found the requirements of section 1026.5, subdivision (b)(1) beyond a reasonable doubt.

## B. *Jury Instruction*

Defendant contends the jury instruction on extensions of NGI commitments (CALCRIM No. 3453) misstated the burden of proof by requiring him to prove his affirmative defense—that he can control his mental condition through medication—by a preponderance of the evidence. Defendant contends his burden should be merely to raise the defense, and that the People should have the burden to prove beyond a reasonable doubt that defendant would not be able to control his mental condition through medication.

13

Defendant argues that the case upon which CALCRIM No. 3453 derives its affirmative defense language, *People v. Bolden* (1990) 217 Cal.App.3d 1591 (*Bolden*), was wrongly decided. Alternatively, defendant asserts that CALCRIM No. 3453 violates his constitutional right to equal protection, because a mentally disordered offender (MDO) does not have the burden of proof to show that medication controls his or her mental disorder and renders him or her not dangerous.

### 1. *Proceedings Below*

The jury was instructed on the findings necessary for an extension of defendant's commitment pursuant to CALCRIM No. 3453. The instruction provided as follows:

"Everardo Montoya has been committed to an outpatient conditional release program. You must decide whether he currently poses a substantial danger of physical harm to others as a result of a mental disease, defect or disorder. That is the only purpose of this proceeding. You are not being asked to decide Everardo Montoya's mental condition at any other time or whether he is guilty of any crime.

"To prove that Everardo Montoya currently possesses or currently poses a substantial danger of physical harm to others as a result of a mental disease, defect or disorder, the People must prove beyond a reasonable doubt that, one, he suffers from a mental disease, defect or disorder; and two, as a result of his mental disease, defect or disorder, he now poses a substantial danger of physical harm to others and has serious difficulty in controlling his dangerous behavior.

"Control of a mental condition through medication is a defense to a petition to extend commitment. To establish this defense, Everardo Montoya must prove by a preponderance of the evidence that, one, he no longer poses a substantial danger of physical harm to others because he is now taking medicine that controls his mental condition; and two, he will continue to take that medicine in an unsupervised environment.

14

"Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true."

### 2. Forfeiture

The People assert that defendant forfeited his challenges to CALCRIM No. 3453 because he failed to object in the trial court. Defendant asserts that the issue was not forfeited because it affects his substantial rights (§ 1259), because his challenge is a purely legal claim, and because an objection at trial would have been futile.

As we shall explain, we will reach the merits of defendant's first argument, which is based on statutory construction, but we find defendant has forfeited his equal protection argument by failing to raise it below.

### 3. Analysis – Statutory Construction

In *Bolden*, the defendant requested the jury be instructed that the prosecution had the burden of proving that he was a substantial danger in a medicated state and that he would not continue to take his medication in an unsupervised environment. (*Bolden*, *supra*, 217 Cal.App.3d at p. 1597.) The *Bolden* court analyzed the language of section 1026.5, noting that it "defines dangerousness *without regard to the effect of medical treatment,*" and thus held that the People are not required to show that a defendant would be dangerous even if medication-compliant. (*Bolden*, *supra*, at p. 1599.)

The *Bolden* court further concluded that even though the People had no burden to prove the defendant was dangerous even if medicated, "the effect of medication in controlling the respondent's dangerousness and whether he will self-medicate in an unsupervised environment may be raised by the respondent as a defense." (*Bolden*, *supra*, 217 Cal.App.3d at p. 1600.) The court explained the nature of an affirmative defense: "[A]n affirmative defense is one which does not negate any element of the crime, but is new matter which excuses or justifies conduct which would otherwise lead

15

to criminal responsibility. For example, necessity is a defense which admits, for the sake of argument, the elements of the charged offense, but offers a justification to avoid criminal culpability. As such, it is an affirmative defense which the defendant must prove by the preponderance of the evidence." (*Id*. at p. 1601.)

The *Bolden* court contrasted affirmative defenses with defenses that "do not admit the elements of the crime, but instead serve to overcome or negate such proof. For example, alibi negates an element of the People's case—identity. Similarly, voluntary intoxication negates proof of an element of some crimes—specific intent. Where the defense would necessarily negate an essential element of the crime charged, the state may not constitutionally place the burden of persuasion on that issue upon the defendant." (*Bolden*, *supra*, 217 Cal.App.3d at p. 1601.)

The *Bolden* court explained that Bolden's claims about the impact of medication admitted the truth of the elements of the People's case. "Stated differently, there is nothing logically inconsistent with the truth of both the elements of the People's case and those of Bolden's defense existing simultaneously." (*Bolden*, *supra*, 217 Cal.App.3d at pp. 1601-1602.) Accordingly, the defense he sought was an affirmative defense, and as such, the state could "constitutionally place upon Bolden the burden of proving his defense by a preponderance of the evidence." (*Id*. at p. 1602.)

*Bolden* was distinguished by *People v. Noble* (2002) 100 Cal.App.4th 184 (*Noble*), in which the court considered the statutory scheme for extension of an MDO commitment. Under that scheme, an MDO commitment "may not be extended unless the prosecution proves, beyond a reasonable doubt, that [the defendant] has a severe mental disorder that is not in remission or cannot be kept in remission without treatment, and that, as a result of the disorder, [the] defendant represents a substantial danger of physical harm to others. (§§ 2970, 2972, subd. (c).) A mental disorder is in remission if its symptoms are controlled by medication. (§ 2962.)" (*Noble*, *supra*, at p. 190.)

16

In *Noble*, the trial court instructed the jury that the defendant had the burden of proving, by a preponderance of the evidence, that he did not represent a substantial danger if medicated, and that he would continue to take his medication as prescribed, even if unsupervised. (*Noble*, *supra*, 100 Cal.App.4th at p. 189.) The *Noble* court agreed with the defendant that under the MDO statutes, the question of whether medication controls an MDO's mental disorder and renders him or her not dangerous is *not* an affirmative defense but rather a "claim that he does not meet two of the three criteria for extending [an] MDO commitment." (*Id*. at p. 190.)

The *Noble* court described *Bolden* as involving "a distinct statutory scheme" and thus held that the jury in an MDO case should not be instructed in the language of *Bolden*. (*Noble*, *supra*, 100 Cal.App.4th at p. 190.) Instead, in an MDO case where the defendant raises the theory "that he is in remission and thus not dangerous to others while medicated," the trial court should instruct the jury that "[t]he People have the burden to prove, beyond a reasonable doubt, that if released, the defendant will not take his or her prescribed medication and in an unmedicated state, the defendant represents a substantial danger of physical harm to others." (*Ibid*.)

Defendant essentially contends that both *Bolden* and *Noble* were wrongly decided. He asserts that *Bolden* was wrong in concluding that, under the NGI scheme, the People do not need to prove that the defendant's dangerousness depends on medication compliance. He asserts that *Noble* was wrong in finding the NGI and MDO schemes different with respect to proof of medication compliance.

Defendant's argument about the NGI scheme is as follows. Section 1026.5, subdivision (b)(1), requires the People to show that "by reason of a mental disease, defect, or disorder," the defendant "represents a substantial danger of physical harm to others." Because the statute is phrased in the present tense, it necessarily "addresses the *present* state of the [defendant]," and thus "logically includes any treatment or medication currently received by [the defendant]."

17

We are not persuaded by defendant's argument. In contrast to the MDO statutes, which expressly require a showing that the defendant's mental health disorder "is not in remission or cannot be kept in remission without treatment" (§ 2970, subd. (a)), section 1026.5 contains no such language. By including references to treatment in the MDO statutes, the Legislature has demonstrated it knows how to require the People to prove, in the context of a civil commitment, that a defendant's dangerousness depends on whether or not the defendant's mental disorder can be treated with medication and whether the defendant will be medication compliant. (Cf. *In re Varnell* (2003) 30 Cal.4th 1132, 1141 [" 'when a pleading and proof requirement is intended, the Legislature knows how to specify the requirement' "]; *People v. Eckard* (2011) 195 Cal.App.4th 1241, 1247 ["the Legislature clearly knows how to write a statute that permits convictions from other jurisdictions to be used as the basis for registration requirements, enhancements, and alternative sentencing schemes"].)

Thus, we will follow *Bolden* and *Noble*, and hold that the NGI scheme does not place a burden on the People to prove a defendant is dangerous even if medicated. We agree with *Bolden* that "the effect of medication in controlling the respondent's dangerousness and whether he will self-medicate in an unsupervised environment" (*Bolden*, *supra*, 217 Cal.App.3d at p. 1600) is an affirmative defense, "which the defendant must prove by a preponderance of the evidence" (*id*. at p. 1601).

Defendant further argues that by placing the burden of proof on him, he was deprived of the benefit of CALCRIM No. 224, the instruction on circumstantial evidence.[2] That argument depends on defendant's assertion, which we rejected above,

---

[2] As given in this case, CALCRIM No. 224 provided as follows: "[B]efore you may rely on circumstantial evidence to find the allegations of the petition are true, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the allegations of the petition are true. [¶] If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to a conclusion that the allegations in the petition are not true, and (continued)

18

that his defense was "a defense which negates an element of the offense" rather than an affirmative defense. As explained above, under the NGI scheme, the question of whether dangerousness can be controlled by unsupervised medication compliance is an affirmative defense as to which the defendant has the burden of proof.

        *4.      Analysis – Equal Protection*

Defendant alternatively claims that if the MDO and NGI recommitment schemes have the different burdens of proof as to medication compliance, the NGI scheme violates his constitutional right to equal protection.

"The right to equal protection of the laws is guaranteed by the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution. The 'first prerequisite' to an equal protection claim is ' "a showing that 'the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' ". . .' " (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1216.) Once such a showing is made, the burden shifts to the state to establish " ' " 'not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' " ' " (*Id.* at p. 1217.)

Defendant contends that NGI's and MDO's are similarly situated, relying on cases involving equal protection challenges to the sexually violent predator (SVP) law: *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*); *People v. Field* (2016) 1 Cal.App.5th 174; *People v. Dunley* (2016) 247 Cal.App.4th 1438 (*Dunley*); and *People v. Curlee* (2015) 237 Cal.App.4th 709. However, none of those cases considered the specific issue of whether NGI's and MDO's are similarly situated for purposes of the burden of proof regarding a medication compliance defense. Thus, none of those cases support

---

another points to a conclusion that the allegations in the petition are true, you must accept the one that points to the conclusion that the allegations are not true. However, when considering circumstantial evidence you must accept only reasonable conclusions and reject any that are unreasonable."

19

defendant's claim. Moreover, defendant himself fails to specifically explain how NGI's and MDO's are similarly situated with respect to the particular issue of a medication compliance defense. (See *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [the "initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged' "].)

We observe that the Legislature has adopted separate statutory schemes for NGI's and MDO's, and that while there are similarities between them, there are also differences. For one, unlike an MDO, an NGI has proved by a preponderance of the evidence that he or she was insane at the time of the crime. Unlike an MDO, an NGI has been acquitted on the basis of insanity but subjected to commitment based on his or her mental condition. (See *Bolden*, *supra*, 217 Cal.App.3d at p. 1599 ["By definition, the only persons coming within section 1026.5's framework are felons who have previously proven their own insanity."].) The question here is whether the equal protection clause requires that MDO's and NGI's be treated alike for purposes of who has the burden of proving the efficacy of medication on dangerousness and the likelihood the individual will self-medicate. This in turn depends on whether MDO's and NGI's are similarly situated with respect to release from commitment and the procedures governing release, the appropriate level of constitutional scrutiny to be applied, and the nature and importance of the interests the state may have in treating them differently for this purpose.

In *McKee*, *supra*, 47 Cal.4th 1172, our high court recognized that the justification for the differential treatment of SVP's and MDO's may entail a factual showing. (*Id.* at p. 1208.) The court in *McKee* therefore remanded the case to give the People an opportunity to show that SVP's presented a greater risk to society than MDO's, and that the protection of society required imposing a greater burden on SVP's before they can be released from commitment. (*Id.* at pp. 1206-1207; see also *People v. McKee* (2012) 207 Cal.App.4th 1325, 1340-1342 [describing evidence proffered on remand].)

20

Here, defendant's failure to raise the equal protection issue below deprived the People of the opportunity to make any such factual showing. Under the circumstances, we find defendant's equal protection challenge was forfeited. (See *Dunley*, *supra*, 247 Cal.App.4th at p. 1447 ["an equal protection claim may be forfeited if it is raised for the first time on appeal"].) Although we may exercise our discretion to reach forfeited issues, we decline to do so in light of the undeveloped record regarding the factual showing necessary to our resolution of defendant's equal protection argument. (Compare *ibid.* [reaching equal protection issue where, after the defendant's trial, the California Supreme Court issued a case supporting the defendant's argument, and where the issue presented was "a question of law" that did not require resolution of disputed facts].)

### C. *Mistrial Motion*

Defendant contends the trial court should have granted his motion for a mistrial when Rynearson volunteered information that violated an in limine ruling about evidence of defendant's immigration status.

#### 1. *Motion in Limine*

The People's trial brief included a motion in limine to "exclude any mention of punishment, sentencing, [and] immigration consequences . . . ." At the hearing on motions in limine, defendant requested that the order be "reciprocal" and that defendant's immigration status be excluded as irrelevant and prejudicial.

The prosecutor argued that defendant's immigration status was relevant to his ability to "partake" in government services and that Rynearson would testify that she was unable to secure defendant certain services due to his immigration status.

The trial court held an Evidence Code section 402 hearing. At the hearing, Rynearson testified that defendant's immigration status was one of his stressors, because it caused him to feel "overwhelmed" in terms of his ability to get a job. Rynearson explained that the stress could lead defendant to decompensate. Rynearson further explained how defendant's immigration status could "serve as a barrier" to his ability to

21

obtain mental health treatment if he was released to the community because he would not qualify for "full Medi-Cal" benefits. While defendant might be able to obtain "emergency Medi-Cal," he might be provided with a "cheap[er]" version of his medication, which might not "work the best" for him.

The trial court ruled that defendant's "immigration status issues . . . should not be discussed." The trial court proposed that Rynearson testify "that there's a barrier to [defendant's] eligibility to qualify for Medi-Cal," which might mean that defendant would not be able to obtain the medication he needs. The trial court also proposed that Rynearson testify that there was "a barrier" to defendant's ability to obtain employment, which could be a stressor for him.

The prosecutor represented that she would admonish her witnesses regarding the trial court's ruling.

### 2. *Mistrial Motion*

When Rynearson was testifying about the services she provided to defendant through case management, the prosecutor asked for an example. Rynearson replied, "I helped with immigration support."

Defendant objected, and the trial court asked counsel to approach. After an unreported bench conference, the trial court admonished the jury, "So ladies and gentlemen, the last answer that was given by the witness there was a question asked about case management and how there's many resources, and the People asked like what. And the witness indicated, for example, 'I help with immigration support.' [¶] Now, immigration is not an issue in this trial. Okay? So you are not to consider anything with respect to the issue of immigration for the purposes of, you know, following the evidence here and maintaining your responsibilities of evaluating the evidence and using the evidence to make a decision concerning the verdict in this case. All right? [¶] So you're not to consider the issue of immigration. Again, that is not an issue that is to be addressed within this trial."

22

The trial court then asked the jury, "Do I have anybody that doesn't understand or doesn't agree with what the Court has just instructed? All of you, if you have a problem or if you have a disagreement, please raise your hand." The trial court noted that no juror had raised a hand, then asked, "Does everybody understand the instruction and agree with the instruction? If so, please raise your hands." The trial court noted that all jurors had raised their hands.

On cross-examination, defendant's trial counsel asked Rynearson about her efforts to help defendant access community resources such as low-cost medication. Rynearson referenced the fact that there may be "barriers" to defendant's access to medication. Rynearson testified that she had explained the process of applying for emergency Medi-Cal to defendant, but that because of defendant's "boundaries in certain circumstances," he could not obtain "full-scope Medi-Cal."

Defendant later moved for a mistrial "based on the Motion in Limine [ruling] being violated." He argued that the jury now understood that when Rynearson referred to "barriers," she meant his immigration status. Thus, the "bell" had been "rung" and could not be "unrung." Although the jury had promised not to consider immigration, there was "no way of knowing" if the jurors would consider that issue.

The prosecutor pointed out that defendant's "particular immigration status was never mentioned." The trial court noted that Rynearson had used the term "immigration support." The prosecutor argued that the testimony would not have led the jury to believe that defendant was undocumented or had "a particular residency status."

The trial court noted that not only had it admonished the jury after the challenged testimony, but it had previously instructed the jurors not to let bias, sympathy, prejudice, or public opinion influence their decision, and that the instruction had explained that bias included nationality and national origin. (See CALCRIM No. 101.) The trial court noted that a similar instruction would be given before closing arguments. (See CALCRIM No. 200.) The trial court further noted that the jury is presumed to be able to follow the

instructions and that the jurors had, in fact, indicated they could follow the admonition not to consider immigration.

With respect to defendant's argument about the repeated testimony about "barriers," the trial court noted that defendant's trial counsel had "been really emphasizing" that issue, causing Rynearson to "respond[] multiple times about the barriers." The trial court indicated it was "almost getting to the point" where Rynearson would be permitted to explain the barriers so the jury would not think that Rynearson was failing to carry out her duties responsibly. The trial court observed that Rynearson was "struggl[ing]" to answer some of the questions in a way that did not "trigger that issue of immigration," but that she was doing a good job by using the term "barriers" instead.

The trial court denied the motion for a mistral.

3.     *Analysis*

A mistrial should be granted if a trial error—which can include a witness's volunteered statement—is so prejudicial that it cannot be cured by admonition or instruction. (*People v. Ledesma* (2006) 39 Cal.4th 641, 683 (*Ledesma*).) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*Ibid*.)

Defendant discusses a number of cases in which a mistrial was warranted due to a witness's volunteered statement. One case involved a volunteered reference to the defendant's confession. (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834.) A mistrial was warranted in that case because evidence of a defendant's confession "eviscerates the presumption of innocence." (*Ibid*.) The other cases involved volunteered references to the defendants' prior criminality. (*People v. Allen* (1978) 77 Cal.App.3d 924, 934 (*Allen*) [witness testified that defendant was " 'on parole' "]; *People v. Roof* (1963) 216 Cal.App.2d 222, 225 [witness testified that defendant was charged with another crime]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 339 [witness testified that defendant was "an ex-convict"].) Such evidence is "generally considered to be

24

incapable of obliteration from the minds of the jurors by the court's direction." (*Roof*, *supra*, at p. 225.)

Defendant appears to take the position that Rynearson's reference to providing defendant with "immigration support," coupled with her reference to "barriers" to defendant's access to medication, suggested that defendant was undocumented. Defendant asserts that "there exists a segment of the population who feel animosity toward anyone they perceive to be in this country illegally." Defendant impliedly equates evidence of a confession and evidence of prior criminality with evidence of being undocumented.

"[C]ases both in California and in multiple other jurisdictions have recognized the strong danger of prejudice attendant with the disclosure of a party's status as an undocumented immigrant." (*Velasquez v. Centrome*, *Inc*. (2015) 233 Cal.App.4th 1191, 1213.) However, defendant has not provided any authority for the proposition that a jury is not capable of setting aside such evidence—i.e., that this was an "exceptional case" in which " 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*Allen*, *supra*, 77 Cal.App.3d at p. 935.) Here, the trial court carefully considered the question and determined that the jury *was* capable of following the court's admonition "not to consider the issue of immigration" as well as the court's admonitions not to let bias regarding nationality or national origin influence its decision.

On this record, the trial court reasonably determined that Rynearson's testimony about providing defendant with "immigration support" was not so prejudicial that it could not be cured by admonition or instruction. (See *Ledesma*, *supra*, 39 Cal.4th at p. 683.) By mentioning that she provided "immigration support," Rynearson did not directly suggest that defendant was undocumented, as opposed to having temporary residency or a similar legal, but not permanent, status. Similarly, Rynearson's later references to "barriers" did not necessarily suggest that defendant was undocumented. And unlike a

25

confession or prior criminality, defendant's immigration status was not directly relevant to the question the jury had to decide in this case.  In sum, the trial court did not abuse its " 'considerable discretion' " by denying defendant's motion for a mistrial.  (*Ibid*.)

### III.    DISPOSITION

The order is affirmed.

_____

Cogliati, J.*

WE CONCUR:

_____

Greenwood, P.J.

_____

Danner, J.

People v. Montoya
H047487

_____

* Judge of the Santa Cruz County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.