Filed 1/22/24 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAMES MCCRAY,<br><br>    Defendant and Appellant. | A166084<br><br>(Alameda County Super. Ct.<br>No. RM08389840)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

BY THE COURT*:

The court orders that the opinion filed in this appeal on December 22, 2023, be modified as follows:

1. On page 6, in the second paragraph, in the set of parenthetical citations that follow the second sentence in the paragraph, delete the following language:

   [dismissing an LPS appeal for mootness but exercising discretion to address important issues likely to recur and evade review]

2. On page 7, in the sixth sentence in footnote 4, change "2018" to "2019" so the sentence reads:

   Without deciding whether, against this backdrop, the 2019 cane-brandishing incident justifies the finding made here that McCray

---

* Streeter, Acting P. J., Goldman, J., Hiramoto, J. (Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution)

is *currently* dangerous to others, suffice it to say, that, as time goes by, the evidence supporting continued recommitment in future years will become increasingly attenuated in the absence of more robust proof tying McCray's mental illness to current dangerousness.

The modifications effect no change in the judgment.

Dated:  January 22, 2024                    STREETER, Acting P. J.

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:  Hon. Andrew A. Steckler

Counsel:      Keith Fox, under appointment by the Court of Appeal, for
                 Defendant and Appellant.

              Rob Bonta, Attorney General, Lance E. Winters, Chief
                 Assistant Attorney General, Susan Sullivan Pithey, Senior
                 Assistant Attorney General, Noah P. Hill, Supervising
                 Deputy Attorney General, and Eric J. Kohm, Deputy
                 Attorney General, for Plaintiff and Respondent.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES MCCRAY,<br><br>    Defendant and Appellant. | A166084<br><br>(Alameda County Super. Ct.<br>No. RM08389840) |

James McCray has been committed to the State Department of State Hospitals (DSH) for a series of one-year terms more or less continuously since 2005 under the statutory scheme governing violent offenders with mental health disorders (OMHD's). (See Pen. Code, § 2960 et seq.).[1] He now appeals from a 2022 order recommitting him for another one-year term.

McCray argues we should reverse the recommitment order for three reasons: (1) contrary to the court's findings, there is insufficient evidence he represents a substantial danger of physical harm to others by reason of a severe mental health disorder; (2) the court erred in finding he voluntarily

---

[1] OMHD prisoners "were previously described as mentally disordered offenders, or MDO's. (See, e.g., *People v. Blackburn* (2015) 61 Cal.4th 1113, 1116 (*Blackburn*).) The Legislature recently changed this terminology to 'offender with a mental health disorder.' (Pen. Code, § 2962, subd. (d)(3); Stats. 2019, ch. 9, § 7.)" (*Public Guardian of Contra Costa County v. Eric B.* (2022) 12 Cal.5th 1085, 1095, fn. 3 (*Eric B.*).) For simplicity's sake, we use the term "OMHD" for all relevant periods of time.

1

absented himself from his recommitment trial; and (3) prior to trial, the trial court failed to obtain from him a knowing and intelligent waiver of his right to a jury. The People argue that this appeal is moot, but on the merits disagree on each point.

While we agree that McCray's appeal must be dismissed as moot, under the exception to the mootness doctrine for important issues that recur on appeal yet evade review, we nonetheless address the trial court's failure to engage in a robust enough oral colloquy with McCray to establish that he knowingly and intelligently waived his right to a jury trial.

## I. BACKGROUND

McCray, 73 years old at the time of his 2022 recommitment trial, suffers from schizophrenia. He was first hospitalized for this condition in the 1970s, and had a long history of auditory hallucinations; delusional beliefs; paranoia that others were trying to hurt or threaten him; tangential and disorganized speech and thinking; flattened affect, which manifested itself as a mismatch between his facial expression and what he was feeling; and lack of motivation, which included disinterest in attending treatment groups or meetings with his treatment team.

McCray was convicted of assault with a deadly weapon in 2004, and sentenced to prison. In 2005, he was found to be an OMHD, and as a condition of parole he was committed for treatment to DSH's predecessor agency, the State of California Department of Mental Health.[2] After being

_____

[2] See Pen. Code, § 2962 (as "a condition of parole, a prisoner who meets [specified] . . . criteria shall be provided necessary treatment by the State Department of State Hospitals"). Prior to 2004, McCray had " 'an extensive criminal history dating back to 1975 with charges including exhibiting a deadly weapon not a firearm, battery, battery with serious bodily injury

released on five different occasions to a conditional release program (CONREP) for outpatient treatment, he was rehospitalized each time for noncompliance with treatment. The throughline leading to all these rehospitalizations was failure to take medications. McCray was last rehospitalized in November 2019.

On June 29, 2022, the Alameda County District Attorney's Office moved to consolidate three pending petitions to extend McCray's OMHD commitment for an additional year. The three petitions covered extensions for 2020 to 2021, 2021 to 2022, and 2022 to 2023, respectively. The court granted the motion to consolidate.

McCray waived his right to a jury trial, and the trial court found the waiver to be knowing, intelligent, and voluntary. The court then conducted a bench trial, which occurred over several days in July, August, and September of 2022. At the August session of trial, the court found that McCray had voluntarily absented himself from the proceedings.

In light of our disposition of this appeal, we need not describe in great detail the evidence presented at McCray's 2022 trial but will instead provide the following general summary.

There was evidence of only one incident involving possible violence by McCray. A CONREP clinical social worker testified that, in October 2019, he went to McCray's room to take him to a medical appointment. He entered the room and spoke to McCray, who was located between the social worker and the door of the room. The social worker described the ensuing interaction as follows:

---

(multiple counts), obstruct/resist police officer, and assault with a deadly weapon.' "

3

"Mr. McCray said, I'm not going anywhere with you. I don't have a mental illness. There's nothing wrong with me. And he has a cane. He uses the cane, and he brandished the cane and stood in front of the door, and said, I'm not going anywhere with you, and then started to walk towards me with the cane. [¶] I . . . told him that if you don't want to go, . . . I can't make you go, but I do need to you move away from the door so I could leave. [¶] And after a short period of time he moved and let me walk out of the room." When the social worker was asked about his perceptions of McCray's conduct during this incident, he said he took it as "a threat to [do] physical harm with the cane."

The social worker also testified to McCray's general pattern of uncooperativeness with treatment, which included "[r]efusing to use transportation. We would have transportation set up for him to come to our program, ParaTransport transportation. He would refuse to get on the vehicle on many occasion[s]." He also "refus[ed] to participate in the group therapy sessions that we schedule and we have for him, . . . continu[ed] [to] insist[] that he was not mentally ill and did not need to be in the program, and on several occasion[s] h[e] refus[ed] to take medication, . . . [and] refus[ed] to get on the van to come in to get his shot."

A state hospital psychiatrist who had worked with McCray and was designated as an expert testified that McCray suffered from schizophrenia and resulting symptoms, such as hallucinations and disorganized behaviors and speech; that these symptoms were not in remission; that McCray had very poor insight into his mental illness and was unaware of his chronic symptoms; and that McCray did not meaningfully participate or engage in his treatment.

4

A state hospital clinical psychologist testified to conducting an evaluation of McCray in order to assess his risk of dangerousness. She pointed to McCray's "history of violent behavior"; opined that this behavior was of "high relevance" to his risk for future violence; and further opined that he had a history of problems with relationships and antisocial behavior that were of "moderate relevance" to his risk for future violence.

A state hospital forensic evaluation report prepared by a senior forensic psychologist in October 2021 concluded that McCray represented a substantial danger of physical harm to others by reason of a severe mental disorder that was not in remission.

The trial court found it was proven true beyond a reasonable doubt that McCray had a severe mental disorder; that the disorder was not in remission and could not be kept in remission without treatment; and that as a result of the disorder, McCray represented a substantial danger of physical harm to others under Penal Code section 2970. The court ordered him recommitted for a period of one year, ending on April 29, 2023.

McCray filed a timely notice of appeal.[3]

## II. DISCUSSION

### A. *McCray's Appeal is Moot*

The People argue McCray's appeal is moot because the order from which he has appealed recommitted him for a term that expired in April 2023, and prior to the expiration of this recommitment order, the District Attorney filed a new recommitment petition. The record further indicates that McCray has since been recommitted for one more year.

---

[3] During the pendency of this appeal, McCray filed a "motion for judicial notice" of a May 5, 2023 order issued by the trial court recommitting him under Penal Code section 2972 until April 29, 2024. We grant this request under Evidence Code sections 452 and 459.

The mootness problem presented here "frequently arises in this area of law given the short duration of conservatorships." (*Eric B., supra*, 12 Cal.5th at p. 1094, fn. 2.) The governing principles of justiciability are familiar ones. In general, it is a court's duty to decide " ' "actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' " (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.)

The application of these principles here is straightforward. When, during the pendency of an OMHD appeal, an event occurs such that the appellate court cannot grant any effectual relief, the appeal becomes moot and should ordinarily be dismissed. (See *People v. Alsafar* (2017) 8 Cal.App.5th 880, 882–883 (*Alsafar*); see also *Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 960–961 (*Joseph W.*) [dismissing an LPS appeal for mootness but exercising discretion to address important issues likely to recur and evade review].) We conclude that *Alsafar* controls, and that McCray's appeal is moot because of his subsequent recommitment in 2023.

But there is an exception to the mootness doctrine for issues of "continuing public importance" that are deemed "capable of repetition, yet evad[e] review." (*Alsafar, supra*, 8 Cal.App.5th at p. 883.) For the evading review exception to apply, there must be more at stake than simple error-correction in an individual case. The exception implicates the fundamental role of an appellate court as a custodian of the law, which is why courts often say it applies to issues that touch upon the "public interest." (*People v. Cheek* (2001) 25 Cal.4th 894, 897–898.)

We may exercise our discretion to address issues of this nature notwithstanding a dismissal for mootness. The capable of repetition

6

exception to mootness has been invoked several times in OMHD recommitment cases, most recently by the Supreme Court in *Eric B.*, but also by a number of Court of Appeal panels over the last 25 years. (See, e.g.*, Alsafar*, *supra*, 8 Cal.App.5th at pp. 886–887; *People v. Dunley* (2016) 247 Cal.App.4th 1438, 1442–1443; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 321; *People v. Rish* (2008) 163 Cal.App.4th 1370, 1380–1381; *People v. Williams* (1999) 77 Cal.App.4th 436, 441, fn. 2.)

McCray argues that his sufficiency of the evidence and absence-from-trial claims meet this standard. Even if we ultimately agreed there is merit to one or both claims of error,[4] these are fact-specific issues and both are of

---

[4] The sufficiency of the evidence issue, in particular, is close on the present record. While even a single opinion by a psychiatric expert that a person is currently dangerous can be sufficient to support the extension of an OMHD commitment (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879), such an opinion must be based on more than speculation. Here, there is evidence that McCray, who is now age 75, continues to be mentally ill. He is in denial about his illness; is resistant to treatment; uncooperative and sometimes vituperative with staff assigned to assist him; and prone to outbursts of "agitation, hostility and bizarre behavior." There is also evidence that, as a much younger man, he had a significant criminal history of assaultive conduct, and that the last episode of such conduct, which took place two decades ago, was caused by his mental illness. Without deciding whether, against this backdrop, the 2018 cane-brandishing incident justifies the finding made here that McCray is *currently* dangerous to others, suffice it to say, that, as time goes by, the evidence supporting continued recommitment in future years will become increasingly attenuated in the absence of more robust proof tying McCray's mental illness to current dangerousness. "The [United States Supreme Court] has repeatedly 'recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' [Citation.] 'Moreover, it is indisputable that involuntary commitment to a [psychiatric] hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena "stigma"

7

concern only to McCray. For us to address them now and render a legal ruling that has no practical effect in this case would be pointless. Should another recommitment proceeding be necessary, we see no reason why either issue could not be brought before us in a future appeal if it recurs in that proceeding. We also find it notable that no effort was made to seek calendar preference in this appeal due to imminent mootness. To avoid mootness in a subsequent appeal, McCray would be well-advised to proceed with greater urgency and seek calendar preference.

Applying the *Eric B.* standard to McCray's contention that the trial court failed to obtain an effective waiver of his right to a jury trial, we come to a different conclusion. This third assignment of error has legal significance going beyond this case. We have seen the identical issue more than once in moot OMHD recommitment appeals since our Supreme Court's 2017 decision in *People v. Sivongxxay* (2017) 3 Cal.5th 151 (*Sivongxxay*), a jury waiver case in which the court "emphasiz[ed] the value of a robust oral colloquy in evincing a knowing, intelligent, and voluntary waiver of a jury trial." (*Id.* at p. 169.) In an effort to rectify what appears to be a persistent problem of deficient jury waivers in some OMHD recommitment cases, we believe a published opinion addressing the jury waiver taken in this case is in order. We therefore turn to that issue.

---

or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.' [Citation.]" (*In re Howard N.* (2005) 35 Cal.4th 117, 127–128, quoting *Addington v. Texas* (1979) 441 U.S. 418, 425–426.)

**B.** *The Record Fails To Show That McCray Made a Knowing and Intelligent Waiver of His Right to a Jury Trial*

**1.  Relevant Proceedings Below**

At the beginning of the trial in July 2022, the following dialogue occurred:

"The COURT:  . . . Good afternoon, all, including, of course, Mr. McCray.

"And [McCray's counsel], this is to be a court trial this afternoon?

"[MCCRAY'S COUNSEL]:  Yes, that is the proposal.  And I can voir dire Mr. McCray on the issue.

"THE COURT:  Okay.  Please.

"[MCCRAY'S COUNSEL]:  So Mr. McCray, you remember we talked about you have the right to have a jury listen to the evidence in this case and make the decision on whether or not you need more treatment at the hospital.

"Do you remember talking about that?

"[MCCRAY]:  Yeah.

"[MCCRAY'S COUNSEL]:  And you decided that you wanted to have the judge listen to the evidence and make the decision, to waive your right to a jury, correct?

"[MCCRAY]:  Yeah, yeah.

"[MCCRAY'S COUNSEL]:  Okay.  So the judge is supposed to make sure that you understand that you have a right to have a jury but that you are waiving that right in order to have the judge make the decision.

"Do you understand?

"[MCCRAY]:  I waive that right.

"[MCCRAY'S COUNSEL]:  Okay.

"[MCCRAY]:  I waive.

9

"[MCCRAY'S COUNSEL]: Your Honor, does the Court or DA have any other voir dire on that issue that you'd wish to hear?

"THE COURT: Mr. [Prosecutor], anything further?

"[PROSECUTOR]: No, Your Honor.

"THE COURT: Okay. That's satisfactory to the Court. So I'll take that as a clear indication of acknowledgement and understanding of the jury right and its waiver."

The record supplies no other indication of McCray's understanding of or agreement to waive his right to a jury trial, such as a jury waiver form.

## 2. Legal Standards

The recommitment of OMHD defendants is governed by Penal Code section 2972.[5] "If the court or jury finds that the patient has a severe mental health disorder, that the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and that by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed, or recommitted to the outpatient program in which the patient was being treated at the time the petition was filed, or committed to the DSH if the person was in prison. The commitment shall be for a period of one year from the date of termination of . . . a previous commitment . . . ." (§ 2972, subd. (c).)

Section 2972, subdivision (a) provides that in recommitment proceedings a trial court "shall" advise an OMHD defendant of "the right to a jury trial" and that "[t]he trial shall be by jury unless waived by both the person and the district attorney." (*Id.*, subds. (a)(1) & (a)(2).) In *Blackburn*,

---

[5] Undesignated statutory references are to the Penal Code.

*supra*, 61 Cal.4th 1113, our Supreme Court, interpreting section 2972, held that a defendant in an OMHD recommitment proceeding with the capacity to make a knowing and voluntary waiver of the right to a jury trial must be personally advised of that right, and that any waiver of that right must be personal, knowing, and voluntary. (*Id.* at pp. 1124–1126.)

A trial court is not required to make, or confirm that a defendant is given, a " 'specifically formulated canvass' " of a defendant's right to a jury trial in the course of determining whether a defendant has given a knowing, intelligent, and voluntary waiver of that right. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 168; *People v. Daniels* (2017) 3 Cal.5th 961, 992–993 (lead opn. of Cuéllar, J.) ["We continue to eschew any rigid rubric for trial courts to follow in order to decide whether to accept a defendant's relinquishment of this [jury trial] right."] (*Daniels*).) "[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." (*Adams v. U.S. ex rel. McCann* (1942) 317 U.S. 269, 278; see *Sivongxxay*, *supra*, 3 Cal.5th at pp. 166–167.)

Our Supreme Court has emphasized that "the trial court is not merely a passive receiver of an attempted [jury] waiver" (*Daniels*, *supra*, 3 Cal.5th at p. 993 (lead opn. of Cuéllar, J.)) and has underlined the importance of a carefully worded oral colloquy in evincing a knowing, intelligent, and voluntary waiver of a jury trial. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169; *People v. Morelos* (2022) 13 Cal.5th 722, 753.) Though there is no one-size-fits-all formula for accomplishing this, there are some clear guideposts.

The court has specifically recommended, for example, advisement on "the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in

11

jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) The Supreme Court has even recommended, "[i]n situations where a defendant has waived counsel, . . . the practice of appointing standby counsel for the limited purpose of discussing with the defendant the decision to waive a jury." (*Daniels*, *supra*, 3 Cal.5th at pp. 999–1000 (lead opn. of Cuéllar, J.).)

Our task as a reviewing court is to independently examine the record to determine whether a defendant's jury waiver was knowing, intelligent, and voluntary. (See *People v. Doolin* (2009) 45 Cal.4th 390, 453; *People v. Vargas* (1993) 13 Cal.App.4th 1653, 1660.) We will "uphold the validity of a jury waiver ' "if the record *affirmatively* shows that it is voluntary and intelligent under the totality of the circumstances." ' [Citation.] We do not start with a presumption of validity that may only be rebutted by signs of a defendant's confusion or unwillingness in entering a waiver. Instead, a reviewing court satisfies itself of a legitimate waiver only when the record affirmatively demonstrates it was knowing and intelligent." (*Daniels*, *supra*, 3 Cal.5th at p. 991 (lead opn. of Cuéllar, J.); see *People v. Collins* (2001) 26 Cal.4th 297, 310.)

The failure to obtain a valid jury trial waiver in an OMHD commitment proceeding "defies ordinary harmless error analysis." (*Blackburn*, *supra*, 61 Cal.4th at p. 1134.) "To speculate about whether a defendant would have chosen a jury trial if he or she had been in a position to make a personal choice would pose insurmountable difficulties, as would an inquiry into what effect, if any, that choice would have had on the outcome of the trial. . . . '[W]here a case improperly is tried to the court rather than to a jury, there is no opportunity meaningfully to assess the outcome that would have ensued in

12

the absence of the error.' [Citation.]" (*Ibid*.)  Accordingly, "a trial court's failure to obtain a required personal jury trial waiver [i]s tantamount to the denial of a jury trial, and as such, it constitutes a 'miscarriage of justice' under California Constitution, article VI, section 13." (*Ibid*.)  Thus, the failure to obtain a valid jury trial waiver in an OMHD commitment proceeding "requires reversal without inquiry into the strength of the evidence in a particular case." (*Id*. at p. 1133.)

That said, "[t]he concept of harmless error" does apply in this context in a "limited sense." (*Blackburn*, *supra*, 61 Cal.4th at p. 1136.)  While "a trial court's failure to properly advise an [OMHD] defendant of the right to a jury trial does not by itself warrant automatic reversal[,] . . . a trial court's acceptance of a defendant's personal waiver without an express advisement may be deemed harmless if the record affirmatively shows, based on the totality of the circumstances, that the defendant's waiver was knowing and voluntary." (*Ibid*.)  "[T]he requirement of an *affirmative* showing means that no valid waiver may be presumed from a silent record." (*Ibid*.)

For trial judges, the practical effect of these standards of appellate review and harmless error is important to appreciate.  Because all of the governing principles here are biased in favor of demonstrably effective waivers, they encourage robust, on-the-record colloquies that leave nothing to assumption or guesswork about what an OMHD defendant was told.

### 3. Analysis

We conclude the record in this case is insufficient to support the determination that McCray made a valid waiver of his right to a jury.

The trial court did not take any steps itself to determine if McCray understood what a jury trial entailed or how it differed from a bench trial. (See *Sivongxxay*, *supra*, 3 Cal.5th at p. 169.)  Instead, the court relied entirely on McCray's counsel's perfunctory questioning of McCray on the

13

topic of his right to jury trial. Counsel began by reminding McCray of a conversation the two of them previously had had concerning McCray's "right to have a jury listen to the evidence in this case and make the decision on whether or not you need more treatment at the hospital," and that McCray "decided that you wanted to have the judge listen to the evidence and make the decision, to waive your right to a jury."

Counsel then asked McCray if he understood that "the judge is supposed to make sure that you understand you have a right to have a jury but that you are waiving that right in order to have the judge make the decision," to which McCray replied twice that he was waiving that right. This exchange sheds no light on McCray's awareness of the nature of the jury right he was abandoning or the consequences of his decision to abandon it. Nonetheless, the trial court declined counsel's invitation to ask further questions and found this exchange showed "a clear indication of acknowledgement and understanding of the jury right and its waiver."

We disagree. Whatever it was that McCray acknowledged and understood is anything but clear. Counsel said nothing to McCray on the record to explain the significance of a jury trial, such as that McCray had the right to participate in the selection of a jury, or that once selected, the jury had to unanimously agree in order to render a verdict. And despite the guidance provided by *Blackburn*, *Sivongxxay*, and *Daniels*, the court failed to explore McCray's understanding of *any* of these matters with him. There was no discussion between the court and McCray about how a jury trial works or the difference between a bench trial and a trial by jury. The court did not even ask McCray's counsel if he concurred with McCray's waiver decision.

The People do not attempt to argue that McCray was sufficiently informed at the hearing of the basic mechanics of a jury trial or its differences

14

from a bench trial.  Instead, they would have us conclude from the "totality of the circumstances" that McCray's waiver was knowing and intelligent.  The People's argument on this point proceeds in two steps.  First, we are told, McCray's counsel's presence and participation was "critical" to the analysis of whether his waiver was knowing and intelligent, including counsel's confirmation to the court that McCray preferred a bench trial, his willingness to "voir dire" McCray on the issue, and his reminding McCray of their previous conversation about his right to a jury trial.  Here, the People rely on pre-*Sivongxxay* cases and the statement in *Daniels* that "[c]ounsel plays a crucial part in transmitting information to the client" about waiver of the right to a jury trial (*Daniels*, *supra*, 3 Cal.5th at p. 996 (lead opn. of Cuéllar, J.)).  Second, the People emphasize that McCray, after recalling talking with his counsel about his right to a jury trial and his preference for a bench trial, "not once, but twice" stated without hesitation that he waived his right to a jury trial.

We are unconvinced.  To begin with, as the *Daniels* court observed, "The phrase, 'You don't know what you don't know' encapsulates the futility of relying on defendants to raise questions or identify misunderstandings on their own when they lack the very basis to understand what lies beyond the scope of their knowledge." (*Daniels*, *supra*, 3 Cal.5th at p. 995 (lead opn. of Cuéllar, J.).)  "[C]onfidence does not imply comprehension.  Individuals are entirely capable of categorically asserting a position without awareness that the roots of that position lie in ignorance or lack of reflection.  It was incumbent upon the court to verify, not merely to assume, that Daniels indeed grasped the actual nature of the jury right—even if only at a basic level.  In his own mind, Daniels may have had an impression of what a jury trial is.  Just what impression that was . . . is well beyond what we can

15

discern from this record." (*Id.* at p. 996 (lead opn. of Cuéllar, J.).) That is equally true here.

The phrase "totality of the circumstances," invoked repeatedly by the People, is not a talisman that serves to validate any waiver colloquy, no matter how general. While it is true that representation by counsel is one of the circumstances to consider in determining whether a defendant's waiver is valid (*Sivongxxay, supra,* 3 Cal.5th at p. 173, fn. 8), it is hardly sufficient. Nor does McCray's represented status take on any greater significance in light of how readily or vigorously he stated his agreement to the waiver. For all we know, his ready assent indicates nothing more than that he understood he was to follow instructions while in court. Under a standard that requires us to determine whether the record "affirmatively demonstrates" an effective waiver (*Daniels, supra,* 3 Cal.5th at p. 991 (lead opn. of Cuéllar, J.); see *People v. Collins, supra,* 26 Cal.4th at p. 310), nothing we see here meets the requisite standard.

The essential problem in this case is that the trial court effectively outsourced to counsel the task of ensuring McCray fully understood what he was giving up, and then did nothing to verify what counsel advised his client. Counsel's remarks indicate only that the two discussed McCray's right to a jury trial, not that they discussed anything about the content of that right, and the remarks give no indication of whether McCray believed he had sufficient time to discuss the matter fully with his counsel. These lacunae in the record underscore the importance of the court directly informing an OMHD defendant—someone who by definition is mentally impaired—about the right being waived, as only then can a meaningful record assuredly be made regarding a defendant's understanding of the meaning of a jury waiver. (See *Blackburn, supra,* 61 Cal.4th at p. 1137 ["Ultimately, we emphasize that

16

the most certain means of ensuring a valid waiver is careful compliance with the express advisement and waiver process explained in this opinion."].)

The record of the waiver taken in this case is similar to those in *People v. Jones* (2018) 26 Cal.App.5th 420 (*Jones*) and *People v. Blancett* (2017) 15 Cal.App.5th 1200 (*Blancett*).  Jones was accused of second degree murder and child abuse.  (*Jones,* at p. 423.)  Represented by counsel, she sought to waive her right to a jury trial.  (*Id.* at p. 428.)  She answered affirmatively to two questions asked by the prosecutor taking her waiver:  " 'Ms. Jones, do you understand your right to a jury trial?' " and " 'Do you agree to waive that right and have [the judge], sitting alone, decide the case?' "  (*Ibid.*)

While acknowledging the precept that no specific form of advisement is required (*Jones*, *supra*, 26 Cal.App.5th at p. 430), the *Jones* panel noted that in several cases where jury waivers were found to be valid, "the trial courts inquired extensively of the defendants before accepting their jury trial waivers, specifically advising them that they would be giving up the right to have their case decided by 12 members of a jury drawn from the community or comprised of citizens."  (*Id.* at p. 431, citing *Sivongxxay, supra*, 3 Cal.5th 151, *People v. Weaver* (2012) 53 Cal.4th 1056, *People v. Wrest* (1992) 3 Cal.4th 1088, and *U.S. ex rel. Williams v. DeRobertis* (7th Cir. 1983) 715 F.2d 1174.)

The *Jones* panel also recognized that the OMHD defendant in that case was represented by counsel and that the record showed she "had some discussion with her attorney before the waiver was taken in that it was her attorney who indicated to the trial court that Jones wanted to waive her right to a jury trial." (*Jones*, *supra*, 26 Cal.App.5th at p. 435.)  But the panel nonetheless reversed, describing what might as well have been the record in McCray's case.  Because "the record does not show whether Jones's attorney ever discussed with her the nature of a jury trial," and because "[t]here is no

showing from this record that Jones understood the nature of the right to a jury trial she was relinquishing," the panel concluded that the trial court did not "take steps to ensure Jones 'comprehend[ed] what the jury trial right entails.' " (*Id.* at pp. 435, 436.) It explained, "The trial court's two-question inquiry of Jones, as to whether she 'underst[ood] [her] right to a jury trial' and whether she agreed to waive that right and have the trial judge 'sitting alone, decide the case' does not affirmatively show that Jones understood the nature of the right to a jury trial she was relinquishing." (*Id.* at p. 423.)

*Jones* relied on *Blancett* (*Jones, supra*, 26 Cal.App.5th at pp. 433–434), which also held that a jury waiver was invalid under circumstances similar to those before us. The *Blancett* court considered whether an OMHD defendant, Blancett, facing a hearing in which he was challenging a requirement that, as a condition of parole, he accept treatment from the DSH as an OMHD, made a knowing and intelligent waiver of his right to a jury based on his confirmation to the court that, as his attorney represented, he was " 'okay with having a judge decide [his] case and not a jury.' " (*Blancett, supra*, 15 Cal.App.5th at p. 1203.)

The *Blancett* court concluded that Blancett "did not waive his right to a jury trial with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." (*Blancett, supra*, 15 Cal.App.5th at p. 1206.) It pointed out, citing *Sivongxxay*, that the trial court did not advise Blancett of his right to a jury trial *or* "explain the significant attributes or mechanics of a jury trial. ([*Sivongxxay, supra*, 3 Cal.5th] at p. 169.) Neither did the court inquire whether [Blancett] had sufficient opportunity to discuss the decision with his attorney, whether his attorney explained the differences between a bench trial and a jury trial, or

18

whether Blancett had any questions about the waiver. (*Id*. at pp. 169–170.)" (*Blancett*, at p. 1206.)

In short, in both *Jones* and *Blancett*, (1) the waiver colloquies were limited to asking the defendants whether they wanted to have their cases decided by the court rather than a jury; (2) the defendants were not advised about any of the other features of a jury trial; and (3) the trial courts did not ask the defendants whether they had had sufficient opportunities to discuss their jury waivers with their counsel. That describes this case as well. On the record before us, the problem we see is not a matter of lack of specificity or failure to give some particular formulation of a waiver admonition. Rather, as noted above, the problem is that we cannot tell what McCray was told about his waiver—at all. Simply alluding to unspecified statements made outside the courtroom by counsel is not enough to establish a valid waiver.

The People attempt to distinguish *Jones* and *Blancett*, pointing out that in those cases the OMHD defendants did not have relevant experience with the justice system. (See *Jones*, *supra*, 26 Cal.App.5th at pp. 436–437; *Blancett*, *supra*, 15 Cal.App.5th at pp. 1206–1207.) By contrast, the People observe, McCray had a great deal of accumulated experience with the commitment process. He "was familiar with OMHD proceedings given that he was initially committed in 2005, and recommitted thereafter." This, in our view, is not a material distinction. We are not convinced we may infer McCray's level of understanding from the fact he had been through some number of commitment and recommitment proceedings before. It is indisputable he had been, but that says nothing about whether anyone ever explained to him what it means to have a jury trial—or to give up the right to one. None of the People's citations to the records in these prior proceedings

19

shows whether there were jury waivers in any of those cases, and if so, whether the waiver advisements were any more robust than the one McCray received in 2022.

In short, the "totality of the circumstances" here does not demonstrate that McCray's waiver of his right to a jury prior to his 2022 recommitment trial was knowing and intelligent. We conclude it was not.

## III. DISPOSITION

The appeal is dismissed as moot.


STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
HIRAMOTO, J.*

---

* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:   Hon. Andrew A. Steckler

Counsel:       Keith Fox, under appointment by the Court of Appeal, for
               Defendant and Appellant.

               Rob Bonta, Attorney General, Lance E. Winters, Chief
               Assistant Attorney General, Susan Sullivan Pithey, Senior
               Assistant Attorney General, Noah P. Hill, Supervising
               Deputy Attorney General, and Eric J. Kohm, Deputy
               Attorney General, for Plaintiff and Respondent.